The STEARNS COMPANY,
LTD., Plaintiff,

v.

UNITED STATES, Defendant.

No. 594–89L.

United States Court of Federal Claims.

Oct. 20, 1995.

---

Bruce F. Clark, Sites & Harbison, Frankfort, Kentucky, for plaintiff.

Silvia Sepulveda–Hambor, General Litigation Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., for defendant. Mark Hartsoe, Office of the Field Solicitor, Knoxville Field Office, Department of the Interior;

John Jasper, Office of the Solicitor, U.S. Department of the Interior; and Jeffrey Einsenberg, Office of General Counsel, U.S. Department of Agriculture, of counsel.

## OPINION

SMITH, Chief Judge.

Plaintiff has asserted a claim for compensation under the Fifth Amendment to the United States Constitution. Its claim is based upon the operation of § 522(e)(2) of the Surface Mining Control and Reclamation Act of 1977 on plaintiff's subsurface mineral rights in land located in the State of Kentucky. This action is before the court on the parties' cross-motions for summary judgment, and defendant's motions to dismiss and to strike the affidavit of plaintiff's mining engineer. At oral argument, the court granted defense counsel's request to allow the parties to file post-hearing briefs on the effect of several recent opinions on plaintiff's core taking claims: *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560 (Fed.Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995); *Shelden v. United States*, 7 F.3d 1022 (Fed.Cir.1993); and *Bowles v. United States*, 31 Fed.Cl. 37 (1994).

The parties cross-motions for summary judgment, and defendant's motions to dismiss and to strike the affidavit of plaintiff's mining engineer hereby are DENIED. A

trial must be held in this case to resolve the remaining issues.

## FACTS

In 1937, plaintiff Stearns Company (Stearns) divided the surface and mineral estate of some 47,000 acres of coal-rich land in McCreary County, Kentucky by selling the surface estate to the federal government.[1] The surface estate became part of the Daniel Boone National Forest. In the 1937 deed, Stearns reserved an easement to allow access to its mineral estate, subject to certain atypical restrictions.[2] The nature of Stearns' easement through the federally-owned surface has been the subject of litigation in the Supreme Court of Kentucky and the United States Court of Appeals for the Sixth Circuit.

In 1978, the Supreme Court of Kentucky held that Stearns' right-of-way was not "public property" within the meaning of a Kentucky statute merely because the United States owned the surface estate. *Department of Natural Resources and Envtl. Protection v. Stearns Coal & Lumber Co.*, 563 S.W.2d 471, 472 n. 3 (Ky.1978). In reaching its conclusion, the Supreme Court of Kentucky expressed the view that any effort by the State of Kentucky to deny Stearns a permit to strip mine premised solely on the fact that the United States held the surface interest would "take[ ] the property of Stearns without compensation and [violate]

1. Since 1937, Stearns also has sold approximately 14,000 mineral acres, leaving 33,353 acres. Stearns added to its complaint another 2,208 mineral acres under land owned by the United States making the total acreage at stake in its claim 35,561. Stearns has not sought a determination of whether it has "valid existing rights" to mine the final block of 2,208 acres.

2. The 1937 deed, as excerpted in a 1987 case before the United States Court of Appeals for the Sixth Circuit, states in the relevant part:

> There is, also, RESERVED, all metalliferous minerals, coal, oil, gas and limestone in, upon and under the described tracts of land; PROVIDED, however, that all operations from mining and removing same [sic] shall be done and carried on in accordance with the following rules and regulations prescribed by the Secretary of Agriculture, viz:
>
> \* \* \* \* \* \*
>
> (2) In prospecting for, and in mining and removing minerals, oil, or gas, and in manufacturing the products, thereof, *only so much*

> of the surface shall be occupied, used or disturbed as in (sic) reasonable and, according to recognized good practice, necessary for the purpose.
>
> (3) In underground operations all reasonable and usual provisions shall be made for the *support of the surface,* and to that end the tunnels, shafts; and other workings shall at all reasonable times be open to inspection and examination by the forest officers and mining experts or inspectors of the United States.

*United States v. Stearns Coal & Lumber Co.,* 816 F.2d 279, 281 (6th Cir.1987) (emphasis added), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987). The Sixth Circuit distinguished the reservation in Stearns' deed from the typical "broad form" deed reservation, common in Kentucky around the time Stearns' deed was executed. The "broad form" reservation allowed the owner of the mineral estate virtually unrestricted access through the surface estate to extract minerals. *Id.* at 281.

both the federal and state constitutions." *Id.* at 473.[3]

Although the foregoing statements by the Kentucky Supreme Court cast doubt on any state effort to limit Stearns' right-to-mine, Stearns, nevertheless, was not exempt from federal regulation. In August 1977, President Carter signed the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201–1328, § 522(e)(2) of which governs mining on "lands within the boundaries of any national forest." 30 U.S.C. § 1272(e)(2). SMCRA establishes a different, and more rigorous, regulatory regime for land "within the boundaries of [a] national forest" than for land outside. *Id.* According to § 522(e)(2), unless a company seeking to mine has valid existing rights, the company must obtain a finding by the Secretary of Interior that the proposal to mine is not "incompatible" with "significant recreational, timber, economic, or other values." *Id.*[4] This requirement is known as a "compatibility determination."

Prior to and after the enactment of SMCRA, Stearns attempted to obtain permission from the federal government to extract coal by strip mining, but each time the federal government denied Stearns' permit applications.[5] Finally, in 1980, Stearns entered into a lease with Ramex Mining Corporation (Ramex) to extract coal by underground mining. Ramex planned to disturb 2.62 acres of the surface to reach the coal below. Before Ramex could break ground, however, on December 3, 1980, the Department of Interior, Office of Surface Mining (OSM), informed Ramex in writing that its operation was "on federal lands" within the meaning of SMCRA § 522(e)(2) and that Ramex must seek a valid existing rights determination or a compatibility determination prior to commencing its mining operation.

Stearns and Ramex at this point filed a declaratory judgment action in the United States District Court for the Eastern District of Kentucky seeking a determination that Stearns' pre-existing easement through the surface was not "on federal lands," and, consequently, § 522(e)(2) should not apply. Stearns and Ramex argued that if the court found that Stearns' easement *was* "on federal lands" within the meaning of the statute, then § 522(e)(2) amounted to an unconstitutional taking. The district court denied both claims, and Stearns appealed to the Sixth Circuit. In upholding the lower court's opinion, the Sixth Circuit concluded that the site of the proposed mining operation "fits squarely within the common sense meaning of the phrase 'on federal lands' as used in

---

3. In *Stearns,* the Sixth Circuit relied on a detailed analysis of Stearns' reservation in the 1937 deed for the conclusion that the deed did not give Stearns the right to strip mine. *Id.* at 283. The Sixth Circuit, however, did find that the 1937 deed granted Stearns "rights impliedly incident to *underground* mining." *Id.* (quoting *Peabody Coal Co. v. Erwin,* 453 F.2d 398, 399 (6th Cir. 1971)) (emphasis added).

4. The language of the "compatibility" requirement in § 522(e)(2) appears facially similar to language in other federal statutes that govern the decisions by land management agencies to lease federal land for mining or other purposes. *See, e.g.,* Federal Land Policy and Management Act of 1976 (FLPMA) § 103(c), 43 U.S.C. § 1702(c) (1988) (defining federal agencies' land management obligations in terms of a duty to maximize the following values: "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical"). FLPMA requires the Forest Service to prepare a "land use plan" to govern the disposition of National Forest land, § 202(b), and the National Environmental Policy Act (NEPA) requires the Forest Service to prepare an Environmental Impact Statement (EIS) on the proposed plan. *See* NEPA § 10(2)(C), 42 U.S.C. § 4332(2)(C) (1988); *City of Tenakee Springs v. Block,* 778 F.2d 1402, 1404 (9th Cir.1985). The more extensive NEPA procedures would apply only when seeking a permit to mine property that is entirely federally owned.

5. Stearns first applied for permission to strip mine from the Secretary of Agriculture (the Forest Service is in the Department of Agriculture) in 1954, but Stearns abandoned its plans when the Secretary denied permission. *United States v. Stearns Coal & Lumber, Co.,* 816 F.2d at 280. In 1976, Stearns again sought permission to strip mine by applying to the Secretary of Agriculture and the Kentucky State Department for Natural Resources and Environmental Protection. *Id.* Although the state agency's initial rejection of Stearns' application to strip mine was overturned by the Supreme Court of Kentucky, the Forest Service's denial—based, in part, on its understanding that the reservation in the 1937 deed did not allow strip mining—was eventually upheld. *Id.* at 283; *Department for Natural Resources and Envtl. Protection,* 563 S.W.2d at 473.

[SMCRA § 522(e)(2) ]." *Ramex Mining Corp. v. Watt,* 753 F.2d 521, 523 (6th Cir. 1985), *cert. denied,* 474 U.S. 900, 106 S.Ct. 271, 88 L.Ed.2d 225 (1985).

Turning to Stearns' Fifth Amendment taking argument, the Sixth Circuit concluded that *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), controlled. The petitioners in *Hodel* argued that the federal government took its property without compensation merely by enacting SMCRA, and the Supreme Court rejected this claim on ripeness grounds. *Id.* at 297. As the Court observed, "the potential for . . . administrative solutions confirms the conclusion that the taking issue . . . simply is not ripe for judicial resolution." *Id.* Interpreting Stearns' claim as a closely related facial challenge to § 522(e)(2) of SMCRA, the Sixth Circuit concluded in *Stearns:*

> Until an administrative disposition is made of this question [whether Stearns has valid existing rights to engage in underground coal mining], we will not know the nature of the restraint imposed by the government. Thus the District Court correctly ruled that plaintiff's claim was not ripe. . . .

*Id.* at 524.

On December 19, 1986, OSM determined that Stearns lacked valid existing rights to mine and found that Stearns must seek a compatibility determination before commencing mining. On September 14, 1989, Stearns exhausted its administrative appeals, and on October 31, 1989, Stearns filed in the Claims Court.[6] Stearns has not applied for a compatibility determination.[7] The substance of Stearns' claim is that the requirement to seek a compatibility determination has eviscerated the easement it reserved in the 1937 deed and that this amounts to either a physical invasion or a regulatory taking without just compensation in violation of the Fifth Amendment.

## DISCUSSION

### I. Defendant's Motion to Strike

A preliminary motion to strike evidence must be addressed before discussing the dispositive motions. As evidence that a taking occurred, Stearns has presented the affidavit of a mining engineer named Aubrey J. Cornette. In his affidavit, Mr. Cornette interprets significant and contested legal terms, such as "valid existing rights" and "compatibility."

■ Defendant has moved to strike this affidavit under RCFC 12(f) on the grounds that it contains "conclusions of law." RCFC 12(f) provides in relevant part: "Upon motion . . . or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." In *Principal Mutual Life Ins. Co. v. United States,* 26 Cl.Ct. 616, 623 (1992), *aff'd,* 50 F.3d 1021 (Fed.Cir.1995), this court struck an affidavit that dealt "with legal issues which fall within the unique purview of the court." The court found that the bulk of the affidavit at issue in *Principal Mutual* involved interpretation of legal terms and thus could not be considered helpful, admissible expert testimony. *Id.* at 625 (citation omitted). Expert testimony that reaches legal conclusions may be admissible only "in exceptional circumstances, *i.e.,* where the testimony concerns 'state law or a technical provision peculiar to the . . . industry.' " *Id.* (quoting *Aetna Life Ins. Co. v. United States,* 16 Cl.Ct. 364, 375 (1989), *aff'd,* 935 F.2d 280 (Fed.Cir.1991)).

■ Plaintiff contends that Mr. Cornette's affidavit merely provides *support* for conclusions of law. Experts may refer to existing law, *see, e.g., Specht v. Jensen,* 853 F.2d 805, 809 (10th Cir.1988), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989), and conclusory terms that touch on legal concepts which may be employed in technical areas, such as patent law, if such

---

**6.** The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902, 106 Stat. 4506 (1992), changed the name of the United States Claims Court to the United States Court of Federal Claims.

**7.** Ramex, at one point, did request a compatibility determination to allow it to mine Stearns' land under its lease, but Ramex has withdrawn its request.

testimony assists the court. *See, e.g., Snellman v. Ricoh Co.*, 862 F.2d 283, 287 (Fed. Cir.1988) (noting that "expert testimony is admissible to explain the meaning of technical terms in the claims and to give an opinion on the ultimate question of infringement."), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3199, 105 L.Ed.2d 707 (1989). In the takings area, experts properly may testify about the effect on the value of the property if its use is limited by a governmental action. *See, e.g., Bowles*, 31 Fed.Cl. 37 (1994). Ultimately, however, the court must apply the law and make a determination on its particular effect on the property.

■ Mr. Cornette states in the affidavit that in his opinion, "the 'compatibility' provisions of § 522(e)(2) vest in the United States the right to determine whether Stearns, or a prospective purchaser of The Stearns Properties, will be allowed to mine the coal. This power in the hands of the surface owner renders worthless the coal rights of the mineral owner." Mr. Cornette concludes that "Stearns no longer has the valid right to mine, lease or sell its deep mining rights" and that the Secretary of Interior would not find mining compatible under SMCRA. Mr. Cornette testifies about the legal significance of SMCRA and how it affects Stearns' mineral rights, and predicts how the Department of Interior will apply the statutory scheme to the land in question in the future. The court finds much of Mr. Cornette's affidavit troubling because his interpretations of legal terms sometimes go beyond assisting as an incidental aid to help the court understand a technical area of law. Nevertheless, the court recognizes that the issue before the court involves mixed questions of law and fact or questions of fact based upon contested legal terms. Therefore, this court denies defendant's motion to strike the affidavit, and instead the court discounts Mr. Cornette's purely legal conclusions in its analysis of the affidavit.

## II. Motion to Dismiss

### A. Ripeness

The government has moved to dismiss on the grounds that this dispute is not ripe for adjudication. The government argues that this dispute is not ripe until Stearns actually utilizes the compatibility determination process. According to the government, this court cannot properly decide whether a taking has occurred until the government has determined that mining is incompatible and thus completely prohibited.

Stearns claims that SMCRA effectively has caused a regulatory taking in the instant case by denying priority to Stearns' superior mineral estate. Stearns contends that OSM's denial of Stearns' claim that it possesses valid existing rights to mine, despite the reservation in the 1937 deed, together with OSM's insistence that Stearns obtain a compatibility determination has effected a compensable taking of Stearns' property. Stearns argues that the requirement to seek a compatibility determination is itself a compensable taking. If the compatibility determination process is a reasonable variance type procedure, then it may be premature to find a compensable taking if one has not sought a compatibility determination. The government's argument assumes, however, that requiring a compatibility determination is a reasonable variance type procedure, which is the precise issue Stearns is arguing before this court.

■ The ripeness doctrine provides that only disputes involving an actual, present controversy are proper for adjudication in federal courts. In the administrative context, the ripeness doctrine requires that relevant administrative agency reach a decision that actually affects the plaintiff before a court will adjudicate a challenge to the agency's action. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court held that a regulatory takings claim was premature when a developer failed to either seek variances or utilize the state's compensation procedure. The Court stressed that plaintiffs must receive the regulatory agency's "final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *See also, Loveladies Harbor, Inc.*

*v. United States,* 15 Cl.Ct. 381, 386–387 (1988) (summary judgment denied); *Lovela-dies Harbor, Inc. v. United States,* 21 Cl.Ct. 153 (1990), *aff'd,* 28 F.3d 1171 (Fed.Cir.1994) (addressing variance procedures in a federal taking claim). To be considered ripe, Stearns must have obtained a final agency decision on how it will apply the regulations to Stearns' mineral estate and have utilized all reasonable variance type procedures. Only a showing that such a procedure would be futile generally would allow the court to disregard this requirement.

■ The Secretary of Interior has determined that Stearns' mineral estate is on federal lands, and that SMCRA applies so that Stearns cannot mine unless Stearns has valid existing rights or obtains a compatibility determination. Stearns has not sought a compatibility determination, but has sought and been denied valid existing rights. Finding that one possesses valid existing rights is the only available variance type procedure that excuses one from the burden of obtaining a compatibility determination. Stearns has been denied valid existing rights and has exhausted all of its appeals on this issue and whether SMCRA applies to its mineral estate. Thus, Stearns has obtained a final, definitive position from the Department of Interior that it must seek a compatibility determination before it can mine. This court, therefore, concludes that Stearns' claim that the requirement to obtain a compatibility determination itself constitutes a taking is ripe because the Department of Interior's position on this issue is final. Stearns cannot pursue further administrative action.

### B. Standing

The government argues that the court must dismiss plaintiff's claims because plaintiff did not own the property at issue when it was allegedly taken and thus lacks standing. On December 3, 1980 through 1988, title to the property at issue was held by The Stearns Coal and Lumber Company, a Michigan corporation. Title now is held by the plaintiff, The Stearns Company, Ltd., a partnership formed under the laws of Kentucky.

■ Transfers or assignments of claims against the government, including taking claims, are subject to and barred by the Anti–Assignment Act, 31 U.S.C. § 3727 (1982), unless the transfer falls within one of the recognized exceptions to the Act. This Act has three main purposes:

first, to prevent persons of influence from buying up claims which might then be improperly urged upon Government officials; second, to prevent possible multiple payment of claims and avoid the necessity of investigation of alleged assignments by permitting the Government to deal only with the original claimant; and third, to preserve for the Government defenses and counterclaims which might not be available against an assignee.

*Kingsbury v. United States,* 215 Ct.Cl. 136, 563 F.2d 1019, 1024 (1977) (citations omitted).

■ Courts have found that a transfer merely was incidental to a corporate change when little or no change in the equitable ownership of the corporation has occurred. For example, in *Kingan & Co. v. U.S.,* 71 Ct.Cl. 19, 44 F.2d 447 (1930), the Court of Claims found that the transfer of a claim from a British corporation to a domestic one did not change the beneficial ownership because:

In substance therefore there was really no transfer of the subject-matter of the claim in question, for, although the bare legal title to the claim might have passed from Kingan & Co., Limited, to the plaintiff under the deeds referred to in the facts, the equitable ownership of the claim at all times reposed in the same individuals, that is, in the hands of the same stockholders.

*Kingan & Co.,* 44 F.2d at 451.

One major exception to the Act is any transfer that is incidental to a corporate merger, consolidation, or reorganization in which "[t]here is no probability that the United States could suffer injury in respect of outstanding claims." *Seaboard Air Line Ry. v. United States,* 256 U.S. 655, 657, 41 S.Ct. 611, 612, 65 L.Ed. 1149 (1921). In a case arising under the anti-assignment statute, 41 U.S.C. § 15, which prohibits the transfer of government contracts, the dissolution of a corporation and consequent formation of a

partnership was found to be "a change in business structure" and not within the purview of either anti-assignment statute. *See, e.g. Thompson v. Commissioner,* 205 F.2d 73 (3d Cir.1953).

■ In the instant case, although bare legal title to the mineral estate has passed from the Michigan corporation to the Kentucky partnership, the equitable ownership of the taking claim at all times remained in the same individuals in the same proportion after the company reorganized as a partnership. Plaintiff's change from corporation to partnership was merely a reorganization in business structure, which falls under an exception to the Anti–Assignment Act.

The government's arguments that this assignment is improper because twelve subsidiaries and various partnership interests were liquidated in the reorganization is unconvincing because the percentage of the overall equity interests in the claim remained the same. The government's argument that Stearns Ltd. received from the Stearns Partnership not just this claim for just compensation, but instead a guaranteed title to the mineral interests at issue is more complex. Defendant has alleged that Stearns reorganized merely to continue this suit. However, no evidence exists to support this allegation. Plaintiff alleges that it reorganized primarily for tax purposes, and the government introduced no evidence to the contrary.

Although plaintiff, the partnership, is not identical to its predecessor Stearns, the corporation, the transfer of this claim does not violate the Anti–Assignment Act because equitable ownership remained the same. Furthermore, no evidence exists that Stearns reorganized just to transfer this claim.

## III. Taking Claims

■ The Fifth Amendment provides, in part: "nor shall private property be taken for public use without just compensation." The right to compensation secured by the Fifth Amendment is among the principal foundations of American liberty, and it is no less fundamental than the rights secured by the First Amendment or the other amendments of the Bill of Rights. *See Dolan v. City of Tigard,* —— U.S. ——–——, 114 S.Ct. 2309, 2320, 129 L.Ed.2d 304 (1994). The purpose of the compensation guarantee is to prevent the government from requiring a few to bear burdens that, in fairness, should be borne by the public as a whole. *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

The Supreme Court has interpreted the Fifth Amendment to require compensation when the government physically and permanently invades private property in any manner, *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), and when the regulation of private property "goes too far." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). No doubt exists that this formulation has caused the courts serious problems. "Goes too far" hardly creates a bright line test, or perhaps even a test at all. *See,* James L. Huffman, *Lucas: A Small Step in the Right Direction,* 23 Entl.L. 901 (1993) ("[G]oes 'too far' ... provides no guidance whatsoever.") It has been criticized as replacing a rule of law with the subjective rule of judges. While subsequent caselaw has given some slight improvement in this area of jurisprudence, the law of taking claims hardly can be considered clear or coherent. *See, e.g., Bowles v. United States,* 31 Fed.Cl. 37 (1994). This court, however, cannot turn this judicial straw into a golden or even predictable rule. Apparently, only the political branches can create a steadfast rule. The courts, however, must as a mechanism of last resort decide cases where this less than helpful rule applies, to the consternation of judges, property owners and the government.

■ Physical takings occur when the government occupies privately owned land for its own purposes. *See, e.g., Hall v. City of Santa Barbara,* 797 F.2d 1493 (9th Cir.1986), *cert. denied,* 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988). "Courts have held that even relatively minor physical occupations are compensable." *Florida Rock,* 18 F.3d at 1569 (citing *Loretto,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 and *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991)).

Courts have recognized that the physical occupation category includes situations in which the government effectively takes title, possession, or denies owners use of their land. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (finding a navigational servitude imposed on a private marina to be compensable); *Shelden v. United States,* 7 F.3d 1022 (Fed.Cir.1993) (finding that a valid mortgage was appropriated when the underlying property was forfeited to the United States).

Courts have held that the government may appropriate property through regulation as well as through condemnation or physical invasion. In *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court announced three factors for determining, whether a regulation "goes too far" and amounts to a taking: (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the government action." *Id.* at 124, 98 S.Ct. at 2659. Nevertheless, in listing the foregoing factors, the Court recognized that there could be no "set formula" for determining when the Fifth Amendment required compensation. *Id.* The answer to the question of whether compensation is due depends on the outcome of "essentially ad hoc, factual inquiries" in individual cases. *Id.* While this often places a severe burden on public and private litigants alike, no method currently exists to avoid this burden under the current status of taking jurisprudence.

The question of whether Stearns' claim can be characterized as a physical or regulatory taking is, in many ways, one of the most difficult issues in this case. Stearns argues that the Department of Interior physically invaded Stearn's property when, on December 3, 1980, OSM sent Stearns a letter informing Stearns of its statutory duty to obtain a determination on "valid existing rights" or compatibility under § 522(e)(2). Stearns alleges that these actions by the United States physically occupied its mineral estate in their effect. Stearns argues that,

like the landowners in *Loretto,* who were forced to grant Teleprompter Manhattan an easement, the government extinguished Stearns' easement to disturb the surface when using the deep mining method. A fundamental premise to this argument is that, under Kentucky law, a mineral estate dominates over the surface estate. *See Akers v. Baldwin,* 736 S.W.2d 294 (Ky.1987). Stearns contends that after the OSM determined that Stearns did not have valid existing rights, the surface estate became dominant over its mineral estate because the owner of the surface, the United States, could now veto any proposed mining by finding that it was incompatible. Separately, Stearns argues that the government has taken Stearns property by regulation. Stearns contends that SMCRA's federal lands provisions go too far because they further the government's own property interest as the owner of the surface estate by effectively prohibiting mining and thus extinguishing Stearns' mineral estate.

This court recognizes that the nature of the compatibility determination process is central to resolving plaintiff's taking claim. If the process is a futile one, or so burdensome that it effectively deprives the property of value, then this court is inclined to find that a compensable taking occurred. The characterization, however, of the government's action as either a physical or a regulatory taking may be important to the resolution of this case. Different methods of analysis apply to determine whether a taking has occurred based upon a physical invasion, *see Loretto,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868, or a regulation, *see Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In applying the principles developed in both physical and regulatory taking jurisprudence, the court is convinced that Stearns' taking arguments only can be resolved at trial.

Since a trial must be held on this issue it makes no sense to resolve in the currently abstract context the question of whether this is a physical or a regulatory taking claim. On the basis of the record seen so far it appears close to the conceptual border. This

type of question is better resolved in a trial then on motions for summary judgment.

## IV. SUMMARY JUDGMENT

■ Pursuant to RCFC 56(c) both parties seek summary judgment on this issue. Summary judgment is proper only when no genuine issue as to any material fact exists. Material facts are those which will make a difference in the result of the case. *See Curtis v. United States,* 168 F.Supp. 213, 216, 144 Ct.Cl. 194 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Courts have been reluctant to grant summary judgement on taking claims because the question of whether a taking has occurred is usually fact-intensive. *See, e.g., Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983); *Brown v. United States,* 30 Fed.Cl. 23, 25 (1993). "The fact that there are cross-motions for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Brown,* 30 Fed.Cl. at 26.

Stearns argues that the compatibility determination is futile because the Secretary of Interior has discretion over whether to find the mining compatible. Plaintiff's geological engineer, Mr. Aubrey Cornette, states in his affidavit that compatibility is not likely to be found by the Secretary for all of Stearns property, and especially the 15,200 acres that fall within an area designated as environmentally sensitive "Wild Rivers." Stearns argues that the compatibility determination process is unduly burdensome because it must be performed separately for each mine.

The government responds that the compatibility process is not futile because the standards supplied in SMCRA limit the Secretary's discretion. As evidence that the process is not futile nor unduly burdensome the government alleges that, in the same national forest where Stearns' property is located, 17 of 17 compatibility determinations requested and not withdrawn before a final decision, have been granted. The government also suggests that the compatibility determination

process is not unduly burdensome because all mines need permits before commencing operations.

The government suggests that all compatibility determinations in this area are favorable, while plaintiffs contend that many potential applicants never apply or withdraw their applications if they are not likely to be granted. The plaintiff argues that the mine specific nature of compatibility determinations prevents plaintiff from realizing the fair market value in a sale of its property. The government responds that Stearns could lease and sell with a warrantee.

The court reiterates the importance of the factual context to its taking analysis. While the court recognizes that the dispute over the nature of compatibility determinations involves legal issues, this dispute is a mixed question of law and fact. The factual aspects of this issue are material because the nature of the compatibility determination process is fundamental to determining whether a compensable taking has occurred here. Since material facts are in dispute, the court cannot grant summary judgment to either side. To efficiently resolve this dispute, the court will hold a limited evidentiary hearing on this central issue.

## CONCLUSION

As indicated in this opinion, the parties cross-motion for summary judgment, and defendant's motions to dismiss and to strike the affidavit of plaintiff's mining engineer are hereby DENIED.

The parties shall file a status report within 60 days of issuance of this opinion setting forth a discovery period and schedule for a limited evidentiary hearing.

IT IS SO ORDERED.