**DEL RIO DRILLING PROGRAMS, INC., et. al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 569–86L.**

United States Court of Federal Claims.

March 15, 1996.

---

**188**

Gerald E. Nielson, Salt Lake City, Utah, for plaintiffs.

Lewis S. Wiener, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This is an action for breach of contract, or in the alternative, for a Fifth Amendment taking. The case was transferred to this judge on January 25, 1994. The matter is currently before the court on plaintiffs' Motion for Partial Summary Judgment regarding the applicability to certain oil and gas leases of the Tribal Consent Act ("TCA"), 25 U.S.C. §§ 323–328 (1994), and on defendant's more comprehensive motion for summary judgment. Oral argument was held on November 18, 1995, and on January 25, 1996, in Washington, D.C.

Del Rio Drilling Programs, Inc. ("Del Rio") and the other plaintiffs allege that the United States, acting through the Bureau of

Indian Affairs ("BIA")[1], violated the terms of leases executed by the Bureau of Land Management ("BLM") granting plaintiffs, or their predecessors in interest, oil and gas mining rights.[2] Plaintiffs further allege, in the alternative, that these actions constitute a taking of their leasehold interests without just compensation in violation of the Fifth Amendment of the United States Constitution. Specifically, Del–Rio contends that by applying the Tribal Consent Act to Del–Rio's mineral leases, the Government caused the leases to be extinguished. For the reasons set forth below, both motions for summary judgment are denied.

## BACKGROUND

This controversy involves land on the Uintah and Ouray Indian Reservation in southern Utah ("Reservation"). Immediately prior to 1948, this land was owned exclusively by the federal Government. In 1948 Congress split the land into surface and mineral estates with the surface estate being transferred to the Ute Indian Tribe ("Tribe") for the creation of the Hill Creek Extension of the Uintah and Ouray Reservation. Act of March 11, 1948, Pub.L. No. 80–440, 62 Stat. 72 (1948) ("the Act"). Title to the land is in the name of the United States, in trust for the Tribe. The Act states that "the foregoing [R]eservation ... shall include surface rights only in lands withdrawn by Executive Order Numbered 5327 ... as interpreted by Circular Numbered 1220...." 62 Stat. at 77. Executive Order No. 5327, along with the Department of the Interior's Circular No. 1220, 53 I.D. 127 (1930), outlines the withdrawal of public oil-shale deposits and lands containing oil-shale deposits from lease or other disposal. These lands were later made available for leasing under the Mineral Lands Leasing Act of 1920, 30 U.S.C. §§ 181–287 (1994). Thus, under the Act, with respect to any lands within the Hill Creek Extension that were withdrawn under Executive Order 5327, the fee simple was severed, with the Government retaining the mineral estate.

---

1. The BIA is vested with power to administer laws governing Indian affairs. 25 U.S.C. § 1a (1994).

2. Both BLM and BIA are divisions of the Department of the Interior.

Between 1968 and 1974, BLM issued several leases covering subsurface oil and gas mining rights in Uintah County, Utah, to plaintiffs or their predecessors in interest.[3] Roughly fifty percent of the land covered by the leases consists of split estates located within the Reservation. The remainder of the land covered by the leases consists of unified estates in which plaintiffs have surface access specifically granted by the leases.

 Plaintiffs hold various royalty interests in the mineral leaseholds.[4] Del Rio acquired "farm out" interests in the subject leases in 1981 and 1982.[5] It obtained record title in six of the eleven leases at issue in 1987 and 1988.[6] The record does not fully reflect the property interests of the other plaintiffs.[7]

The leases are of a standard form. Section 1 describes the rights of access:

> The lessee is granted the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and gas deposits, except helium gas, in the lands leased, *together with the right to construct and maintain thereupon, all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment thereof,* for a period of 10 years, and so long thereafter as oil and gas is produced in paying quantities; subject to any unit

agreement to govern the lands heretofore and hereafter approved by the Secretary of the Interior, the provisions of said agreement to govern the lands subject thereto where inconsistent with the terms of this lease.

Ex. A to Pls.' Compl. at 2 (emphasis added). Plaintiffs assert that this language reflects a recognition that the Government transferred to the lessees its own pre-existing right-of-way over the surface estate. They also contend that this section was breached by the Government when BLM and BIA gave the Tribe power to veto the granting of rights-of-way by the Secretary of the Interior ("Secretary").

On December 20, 1979, Del Rio received approval of its Application for Permit to Drill ("APD") for the Flatrock # 30–2A site from BLM.[8] This approval included the following condition: "Permits for road rights-of-way and drilling pads have not been applied for from BIA. Where the Ute Tribe does not own the minerals, these [rights-of-way] must be acquired before drilling." In subsequent APD approvals and approvals of requests to survey, BIA and BLM iterated the requirement to obtain rights-of-way from the Tribe in order to proceed. The Government contends that, if the plaintiffs have a cause of action, it began to accrue when they received these notices.

3. The leases are governed by the terms of the Mineral Leasing Act which grants the Secretary of the Interior the power to issue oil and gas leases on public lands. 30 U.S.C. § 226(a) (1994). This authority has been delegated to the BLM by the Secretary. 235 DM 1.1K (Department of the Interior Departmental Manual).

4. Defendant, through a footnote in its May 24, 1995 Proposed Findings of Uncontroverted Facts, raised the issue of whether Del Rio and the other plaintiffs have a protected property interest in the subject leases. Defendant did not address the issue in its briefing, however. The court notes that at the time of filing suit, Del Rio was not the record owner of any of the leases but did have "farm out" agreements with several leaseholders. *See infra* notes 5 and 6. Other plaintiffs apparently obtained their leaseholds prior to filing this action. While it is unnecessary to address the issue raised by defendant at this point, it can be more fully asserted in future proceedings.

5. Under a "farm out" agreement the lease owner, in exchange for royalties or the obligation to drill a test well, assigns an interest in the lease to a "farmee" to undertake investigation into the production of oil or gas from the leased land. Such an agreement is executory in nature and until it is fully performed and the assignment is executed, there is no privity of estate between the lessor and the assignee.

6. Del Rio obtained record title in leases U–6612, U–6634, U–10163 and U–27043 on August 1, 1987, and record title in leases U–10162 and U–10164 on March 1, 1988.

7. Counsel for Del Rio Drilling stated during oral argument that the current motion for partial summary judgment takes into account the position of all plaintiffs.

8. 43 C.F.R. § 3162.3–1(c) (1995) requires the submission to BLM· of an APD for each well.

A total of six wells have been drilled by Del Rio since 1979.[9] On December 10, 1979, Del Rio entered into a separate agreement with the Tribe to operate and maintain an existing airstrip near the mineral leases. On September 1, 1981, BLM approved the Oil Canyon II Unit Agreement, which consolidated a number of leases, including the ones at issue here, for the purposes of simplifying the calculation of royalties.[10] Del Rio, as unit operator, also obtained a permit from BIA, with the Tribe's consent, to take water from the Towave Reservoir.[11]

On November 1, 1982, the Chairman of the Ute Tribal Business Committee wrote to the Vernal District Manager of the BLM, stating: "[t]his is to formally notify your office that the Ute Indian Tribe is adamantly opposed to any form of resource development in the Bookcliff Resource Area."[12] The Hill Creek Extension of the Uintah and Ouray Reservation is part of the Bookcliff Resource Area, in which some of the leases are located. On May 16, 1983, Del Rio applied for a Suspension of Operations and Production ("SOP") for a number of leases committed to the Oil Canyon II Unit, citing inclement weather and the need to wait for Tribe approval of the lessees' right-of-way applications. The leases were otherwise due to expire on June 1, 1983, for lack of production that would hold the Unit. The SOP was granted through September 1, 1983.

On July 14, 1983, the Tribe passed Resolution No. 83–134, which provides:

[T]he Tribe hereby refuses to grant, nor give permission to the Secretary of the Interior or his delegate to grant or approve, any easement, surface lease, or right of way relative to mineral exploitation and/or roadway construction within . . . the "Hill Creek Extension."

On August 23, 1983, Del Rio requested an indefinite SOP on the Oil Canyon II Unit. This was granted by BLM based on "restrictive measures imposed by the Tribe's resolution." On September 8, 1983, BIA officially advised Del Rio of the Tribal resolution, stating that "[c]onsequently, this office considers all of those applications previously submitted for rights-of-way in this area as void." BIA sent a follow-up letter on December 14, 1983, restating the contents of the September 8 letter.

On January 25, 1984, BIA requested information regarding two of Del Rio's pending right-of-way applications relating to a proposed pipeline and access road. The letter requested that Del Rio provide proof that the proper easements were obtained. On February 10, 1984, Del Rio responded with proof of payment of money damages resulting from the usage of rights-of-way on two wells where easements were not obtained and explanations for two other wells. In a letter dated February 28, 1984, BIA noted the lack of valid easements for four well sites run by Del Rio. It notified Del Rio that the agency was referring the subject leases to BLM for termination for noncompliance.[13] Del Rio replied by threatening to file suit.

9. It is unclear from the record whether any rights-of-way were sought or granted before the drilling of the six wells.

10. Unitization of leases allows them to be jointly operated for the purposes of production as if they were one lease, even if the leases are owned by separate entities. 30 U.S.C. § 226(m) (1994). Inclusion of a lease within a unit allows the lease to continue in effect as long as the unit persists, provided that production of oil or gas is maintained within the unit at paying quantities prior to expiration of the lease. *Id.* If the unit is not producing paying quantities, the unit plan may be voluntarily terminated and the underlying leases extended for two years. *Id.*

On May 21, 1981, Del Rio had received approval from BLM for the first Oil Canyon Unit. For reasons which do not appear in the record, this unit was terminated by Del Rio shortly thereafter on June 4, 1981.

11. It is unclear from the record why Del Rio sought tribal consent for the airstrip lease or the permit to take water from the Towave Reservoir, or if any other right-of-way applications were submitted to BIA. The resolution of this ambiguity, however, is immaterial to the determination of the legal issues raised by the motions.

12. The letter goes on to describe the "great cultural, historical, and religious significance for members of the Tribe" of the Hill Creek Extension.

13. The source of BIA's authority to refer the leases to BLM for noncompliance is unclear to the court.

On March 11, 1986, BLM notified Del Rio that the current SOP for the Oil Canyon II Unit would terminate on July 1, 1986. Del Rio requested another SOP on July 28, 1986, which was granted by BLM on August 8, 1986. Del Rio commenced this action on September 11, 1986.

On January 30, 1987, Del Rio requested the termination of the Oil Canyon II Unit Agreement, effective January 29, 1987. This had the effect of extending the subject leases two years. 43 C.F.R. § 3107.4 (1995). By January 29, 1989, all the subject leases had expired without producing paying quantities of oil or gas.

## DISCUSSION

■ The Government relies on the Tribal Consent Act ("TCA") to defend the insistence of BLM and BIA that plaintiffs obtain tribal consent to rights-of-way across the surface estate. The TCA, passed in 1948, shortly before the creation of the Reservation and well before the creation of the leaseholds, allows the Secretary, acting through BIA, to issue rights-of-way [14] over tribal lands when the land is held in trust for Indians. 25 U.S.C. § 323. Certain tribes, however, including the Utes, are granted the right to preclude the issuance of such rights-of-way. 25 U.S.C. § 324 (hereafter "Section 324").[15] Defendant contends that from their creation the leaseholds were subject to this statutory limitation.[16] Plaintiffs counter that when the Government severed and retained the mineral estate it created a dominant right of access over the surface which was merely transferred to plaintiffs when the leases were executed. According to plaintiffs, the TCA would not apply under these circumstances.

Plaintiffs seek summary judgment only on the issue of whether the TCA applies to the subject leases. The court notes, however, that even if they were successful in confirming the legal point advanced in their motion, plaintiffs would not have established liability under either a contract or a takings theory of recovery.

Defendant, for its part, makes three points in its motion, the first two of which, if successful, would constitute comprehensive defenses. The first is that the TCA applies to the leases. This would constitute a defense to both the takings and the contract theory of the case. The second is that plaintiffs' claims are untimely. This too would constitute a defense to both the takings and breach of contract theories. The third is that plaintiffs lost their right to challenge the applicability of the TCA by not pursuing a declaratory judgment action in district court while the leases were still viable. It follows, according to defendant, that plaintiffs now must concede the validity of the application

---

**14.** A right-of-way is "an easement for passage or access upon or across the lands of another." BLACKS LAW DICTIONARY, p. 425 (3d ed. 1991). A right-of-way is required to build improvements such as roads or pipelines across another's property. *See* 43 U.S.C. § 1761 (1988).

**15.** In relevant part, Section 324 provides:

No grant of a right-of-way over and across any lands belonging to a tribe ... shall be made without the consent of the proper tribal officials. Rights-of-way over and across lands of individual Indians may be granted without the consent of the individual Indian owners if (1) the land is owned by more than one person, and the owners or owner of a majority of the interests therein consent to the grant; (2) the whereabouts of the owner of the land or an interest therein are unknown, and the owners or owner of any interests therein whose whereabouts are known, or a majority thereof, consent to the grant; (3) the heirs or devisees of a deceased owner of the land or an interest therein have not been determined, and the Secretary of the Interior finds that the grant

will cause no substantial injury to the land or any owner thereof; or (4) the owners of interests in the land are so numerous that the Secretary finds it would be impracticable to obtain their consent, and also finds that the grant will cause no substantial injury to the land or any owner thereof.

**16.** Defendant contends that this statutory limitation is specifically incorporated in the leases at paragraph 1:

This oil and gas lease is issued for a period of ten (10) years to the above-named lessee pursuant and subject to the provisions of the Mineral Leasing Act and subject to all rules and regulations of the Secretary of the Interior now or hereinafter in force, when not inconsistent with any express and specific provisions herein, which are made a part hereof.

App. to Second Am.Compl., Ex. A, as well as section 2(*o*) of the lease. *See infra* note 22. This provision, however, cannot make applicable a statute that would not otherwise apply by its own terms.

of the TCA. Even if defendant is correct as to the latter point, however, it would not constitute a defense to a contract theory of the case—only to the takings claim. From all of this, it follows that if the complaint is not barred by the statute of limitations, the issue of whether the TCA applies to the leases must be resolved.

*Statute of limitations*

■ Under either a takings or breach of contract theory, plaintiffs had to file their claims within six years of accrual to avoid being barred. 28 U.S.C. § 2501 (1994). The complaint was filed on September 11, 1986. Any action that accrued before September 10, 1980, therefore, would be foreclosed. In making their arguments, the parties' emphasis is on the takings claim. They do not address whether accrual considerations are different when analyzing a breach of contract claim. While the causes of action are distinct, the court is of the view that there is no practical distinction in the present case. Both claims require an injury in fact, as well as damages. *Terteling v. United States,* 167 Ct.Cl. 331, 338, 334 F.2d 250, 254 (1964) (in a breach of contract case, a claim does not accrue until the claimant has suffered damages); *Stearns v. United States,* 34 Fed.Cl. 264, 270 (1995) (for a takings claim to be ripe, the relevant agency has to reach a decision that has a direct effect on the plaintiff). *See also Shermco v. United States,* 6 Cl.Ct. 588, 591 (1984) (stating that a cause of action for purposes of 28 U.S.C. § 2501 does not accrue until the claimant has suffered damages). The question is, therefore, when did events first transpire "entitling the claimant[s] to bring suit alleging the breach [or takings]." *Nager Elec. Co. v. United States,* 177 Ct.Cl. 234, 240, 368 F.2d 847, 851 (1966).

Defendant argues that the cause of action accrued in 1979 when the plaintiffs received the APD approval for Flatrock # 30–2A. It contends that the approval served as notice to plaintiffs of the tribal consent requirement. To support this contention the Government cites published BIA and BLM policy requiring tribal consent, correspondence between BIA and plaintiffs regarding the tribal consent requirement and several regulations covering oil and gas leases.[17]

While it is true that plaintiffs were notified of BIA's position in 1979, there was no actionable injury at that point; the lessees had not incurred any damages.[18] While BIA notified the lessees that they had to obtain tribal consent, the Tribe had not expressed its position, and the BIA had not turned down any applications for drilling permits for lack of rights-of-way. Both a takings claim and a breach of contract claim would have been premature in 1979. *See Terteling,* 167 Ct.Cl. at 338, 334 F.2d at 254; *Stearns,* 34 Fed.Cl. at 270; *Shermco,* 6 Cl.Ct. at 591.

The earliest that damages could have accrued would be after the September 8, 1983 letter from BIA informing plaintiffs of the passage of Resolution 83–134 and notifying them that their previous applications for rights-of-way were void. Without ruling that plaintiffs suffered damages or when those damages may have been incurred, the court holds that the first point at which consequences might have become actionable was after plaintiffs lost access to the minerals. That could not have occurred earlier than September 8, 1983. Therefore, the complaint is timely. It must now be determined if the TCA applies to the subject leases.

---

**17.** Both parties cite to the *Notice to Lessees and Operators of Federal and Indian Onshore Oil and Gas Leases,* 41 Fed.Reg. 18116 (1976), and the *Onshore Oil and Gas Order No. 1; Approval of Operations on Onshore Federal and Indian Oil and Gas Lease,* 48 Fed.Reg. 48916 (1983), as support for their positions. However, neither document relates to the question at hand. Both are directed towards the rehabilitation of the surface estate by the mineral estate holder. They do not speak to the applicability of the TCA.

**18.** Defendant also suggests that, at the time plaintiffs became aware of BIA's intent to impose the consent requirement, plaintiffs should have

commenced an action under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1994), in federal district court, seeking a declaratory judgment. Plaintiffs may have had such a cause of action in 1979, but that fact does not affect the determination of timeliness of the causes of action before this court. It is not enough that *any* claim accrues more than six years before the filing date, but rather that the specific claim at issue accrued more than six years earlier. The court notes that defendant has not made the argument that plaintiffs have failed to exhaust their administrative remedies.

*Tribal Consent Act*

In relevant measure, the TCA provides that the Secretary cannot grant rights-of-way across tribal lands without the consent of tribal officials. *See* Section 324. Defendant contends that the leases at issue are subject to this limitation because the surface estate belongs to the Tribe. Plaintiffs respond, however, that the TCA does not apply to the subject leases because an implied right of access was created when the Government severed and retained the mineral estate in 1948. According to plaintiffs, the Government *retained*, rather than created or granted a right-of-way in 1948, and that that right-of-way was merely transferred to plaintiffs along with the leased mineral estate. Consequently, under plaintiffs' theory, the TCA's requirement of tribal consent would be inapplicable and BIA and BLM would not have the right to deny access to plaintiffs merely because of that statute.

Because the lands at issue were oil-bearing lands, only the surface estate became part of the Indian Reservation. 62 Stat. at 77. The United States reserved to itself by reference the mineral estate. *Id.* ("The foregoing [R]eservation ... shall include surface rights only in lands withdrawn by Executive Order Numbered 5327....."). The Government later leased to plaintiffs or their predecessors in interest the right to exploit these mineral deposits.

Defendant's primary argument is that when the severance of the estates occurred, the Government's retention of the mineral estate was not accompanied by a concomitant right of access across the surface. Accord-

ingly, because the Government could give no greater interest than it kept, plaintiffs acquired no right of access under the leases. Of course, if this view is correct, the Government was marketing something akin to the proverbial swampland in Florida. The court is satisfied that is not what occurred, however.

■ Defendant has argued that federal law controls as to whether any right-of-way was reserved by implication when the mineral estates were severed in 1948. The Supreme Court, however, has stated that "[i]t is well settled that a conveyance by the United States of land which it owns beneficially or, ..., for the purposes of exercising its guardianship over Indians, is to be construed, in the absence of any contrary indication of intention, according to the law of the State where the land lies." *United States v. Oklahoma Gas Co.*, 318 U.S. 206, 209–10, 63 S.Ct. 534, 536, 87 L.Ed. 716 (1943) (citations omitted). To similar effect is *Oklahoma v. Texas*, 258 U.S. 574, 594–95, 42 S.Ct. 406, 414, 66 L.Ed. 771 (1922), where the Court held that, in the absence of an expressed contrary intent, the United States will be taken to have assented "that its conveyance should be construed and given effect in this particular according to the law of the State in which the land lies." *See also Burkey v. United States*, 25 Cl.Ct. 566, 575 (1992) (the law of the situs is applied in determining the nature of the property interest). The court has found no contrary indications to the effect that state law should not apply.[19] Thus, the court looks to Utah real property law to determine the nature of the interest created in 1948.[20]

19. Defendant argues that because the lands involved are within an Indian Reservation, state law regarding real property does not apply. Defendant cites as instructive the Indian Nonintercourse Act, 25 U.S.C. § 177 (1994), which makes any "purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian Nation or tribe of Indians ..." invalid. This provision, however, is irrelevant to this controversy because it applies only to purchase or grants *from* Indians, not to Indians. *See id.*

20. In any event, there is no reason to think "federal law" would yield a different result. At least two cases have found that the severance of the mineral estate creates an implied right of access across the surface. In *Kinney–Coastal Oil*

*Co. v. Kieffer*, the Supreme Court stated that where the Government reserves the mineral estate, "together with the right to prospect for, mine, and remove the same" in a grant of the surface estate, there is "a servitude laid on the surface estate for the benefit of the mineral estate...." 277 U.S. 488, 504, 48 S.Ct. 580, 583, 72 L.Ed. 961 (1928). The Tenth Circuit iterated this holding in *Transwestern Pipeline Co. v. Kerr–McGee Corporation*, 492 F.2d 878, 882–83 (10th Cir.1974), *cert. dismissed*, 419 U.S. 1097, 95 S.Ct. 691, 42 L.Ed.2d 689 (1975). The court recognizes that the reservation clause at issue in those cases included the "right to prospect for mine and remove the same," whereas the reservation here reserved the mineral rights in lands containing oil shale deposits "for the purpose of investi-

██ In Utah, as a general matter, "ownership of mineral rights in land is dominant over the rights of the owner of the [surface estate] to the extent reasonably necessary to extract minerals." *Smith v. Linmar Energy Corp.*, 790 P.2d 1222, 1224 (Utah 1990) (citing *Flying Diamond Corp. v. Rust,* 551 P.2d 509, 511 (Utah 1976)).[21] Under Utah law, when the Government reserved the mineral estate to itself, a dominant right of access across the surface estate was created "to the extent reasonably necessary to extract minerals." *Id.* In this respect, Utah law seems to coincide with general principles of oil and gas law:

> If in the grant or reservation of a separate interest in oil and gas the grantor does not expressly grant or retain such legal relations as are necessary for the production and operation of the land for oil and gas purposes, these relations are held to be created by implication.

1A W.L. Summers, *The Law of Oil & Gas* § 133, at 229–31 & n. 16 (1956). The reservation, in other words, created an implied easement of necessity in the United States to get the full benefit of the mineral estate.

██ It must then be determined if this reservation of an easement, and its subsequent transfer, runs afoul of the TCA. We hold that it does not. By its own terms, the statute only gives a veto to the tribal authori-

ties when a right-of-way is granted across Indian lands. Here, the Government merely kept part of the fee estate and gave the Tribe an interest that was burdened from birth by a right-of-way. From the outset the Tribe obtained a surface estate that was subservient to the right of access of the mineral estate holder. There can be no question, therefore, that between the time of the severance and the issuance of the leases the United States not only owned the oil and gas in the abstract, but also owned the right to access those minerals by going across the surface.

Having held that the United States retained an easement by necessity, it would appear that the defendant has no further basis for contending that that easement was not transferred to plaintiffs or their predecessors in interest, either by operation of law, or under the leases themselves. As the defendant admitted in its brief, the Government "grants to [plaintiffs] exclusive dominion over the development of the leased Federal minerals, *along with whatever rights the United States has to surface access.*" D.Cross Mot. for Sum.J. at 25 (citing Section 1 of the lease) (emphasis added). Nevertheless, defendant contests what would appear to be the necessary result of this holding. It contends that any transfer of a right-of-way was subordinate to the TCA and its associat-

gation, examination and classification." Exec.Order No. 5327 (April 15, 1930), *reprinted in* 1 *Herbert Hoover, Proclamations and Executive Orders* 560 (1974), as applied by the Act of March 11, 1948. The court further notes that the leases at issue here granted "the right to construct and maintain ... all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment [of its mineral rights]." App. to Second Am.Compl., Ex. A. Therefore, the principles set out in *Kinney–Coastal* and *Transwestern Pipeline* are not clearly applicable to the case at bar.

**21.** The law in other western states is to similar effect. *See, e.g., Notch Mountain Corp. v. Elliott,* 898 P.2d 550, 556 (Colo.1995) (en banc) ("severed mineral owner has the right to use that portion of the surface estate that is reasonably necessary to develop the severed mineral interest"); *Mai v. Youtsey,* 231 Kan. 419, 646 P.2d 475, 479–80 (1982) (mineral lessee can use the surface of land "in carrying out the legitimate

object of the lease"); *Carbon County v. Union Reserve Coal Co., Inc.,* 271 Mont. 459, 898 P.2d 680, 689 (1995) ("transfer of mineral interest includes, by implication, the incidental rights reasonably necessary to extract the mineral"); *Turley v. Flag–Redfern Oil Co.,* 782 P.2d 130, 135 (Okla.1989) (surface estate is servient to the dominant mineral estate for the purposes of oil & gas development); *Melton v. Sneed,* 188 Okla. 388, 109 P.2d 509, 512 (Okla.1940) ("In the absence of language indicating a contrary intent, a grant of such incidental rights as are essential to the full enjoyment of the property conveyed will be implied"); *Heikkila v. Carver,* 416 N.W.2d 593, 596 (S.D.1987) ("ownership of oil & gas rights carries with it by implication the means of enjoying the mineral estate"); *Moser v. U.S. Steel Corp.,* 676 S.W.2d 99, 103 (Tex.1984) (mineral owner has dominant right to make any use of surface that is reasonable and necessary incident to the removal of minerals). *See also Phillips v. Fox,* 193 W.Va. 657, 458 S.E.2d 327, 332 (1995) (ownership of mineral estate includes right of access over surface estate).

ed regulations.[22] Of course the "right" to exploit the minerals would be worthless without the additional right to access them. If the lessee of the mineral estate has to ask the owner of the surface for a right-of-way to access the minerals, then the lessee has no easement at all. This is tantamount to saying that, despite the Government's ostensible transfer of the easement in the leases themselves, its effort to do so was of no effect.

■ The specific question raised is whether a transfer of a right-of-way is embraced within the limitations imposed by the TCA under Section 324. When construing a statute, the court need not conclude that the Secretary's interpretation is the only reasonable interpretation or even "that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). We "will sustain the Secretary's construction ... if it is reasonable, even though another construction appears equally plausible." *Blackfeet Indian Tribe v. Montana Power Co.*, 838 F.2d 1055, 1057–58 (9th Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 79, 102 L.Ed.2d 56 (1988) (citing *Southern Pac. Transp. Co. v. Watt*, 700 F.2d 550, 552 (9th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 393, 78 L.Ed.2d 336 (1983)). *See United States v. Rutherford*, 442 U.S. 544, 553, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1978); *Udall*, 380 U.S. at 16, 85 S.Ct. at 801. In these cases, however, the Secretary's interpretation long had been a matter of public record and discussion. *Rutherford*, 442 U.S. at 553–54, 99 S.Ct. at 2475–76; *Udall*, 380 U.S. at 17, 85 S.Ct. at 801–02. In the present case, however, there has been no clear or consistent delineation of the agency's position with respect to the application of the TCA to leases on split estate lands. The court,

therefore, will take a hard look at the TCA before construing it in a way that nullifies what appear to be valid leases.

The court begins with the leases themselves, which provide in Section 1 that the lessee is granted the right to construct and maintain improvements on the land. As the Government admitted in its brief, the lease transferred to plaintiffs all rights the United States had to surface access. The wording of the leases, therefore, suggests that, at least until 1974 when the last of the leases were issued, BLM operated under the assumption that the Government had retained access rights, and that it could, without restriction, transfer them to lessees. This is confirmed by the affidavit of Howard Piepenbrink, former Acting Chief, Division of Real Estate Services, Office of Trust and Economic Development, Bureau of Indian Affairs, United States Department of the Interior. His job duties included implementation of statutes and regulations pertaining to the issuance of rights-of-way for Indian trust lands. He states:

> A lessee or its authorized operator may use the surface of trust lands within a particular federal lease issued for this excluded mineral estate, without the need of a right-of-way, to the extent the use is necessary for the exercise of rights granted by that lease, subject to reasonable conditions for access.
>
> \* \* \* \* \* \*
>
> The foregoing applies to all oil and gas operations conducted by Del Rio Resources in the Hill Creek Extension of the Uintah and Ouray Reservation, to the extent that Del Rio is a federal lessee or approved assignee, or an authorized operator.

---

**22.** Defendant, in its briefs, repeatedly points to Section 2(*o*) of the leases as instructive on plaintiffs' obligation to obtain tribal consent. Section 2(*o*) states that the lessee agrees "to comply with all statutory requirements and regulations hereunder...." This section is inapplicable to the leases at issue however, because Section 2(*o*) only applies to patented lands and the lands at issue here are not patented.

The court notes that the Secretary of the Interior has promulgated a series of regulations per-

taining to rights-of-way over Indian land under the TCA. *See* 25 C.F.R. § 169 (1995). Section 169.3 states that tribal consent is required where rights-of-way are to be granted over both tribal and individually owned lands, with certain exceptions to the consent rule for individually owned lands. 25 C.F.R. §§ 169.3(a)–(b); *cf.* 25 U.S.C. § 324. This language essentially mirrors the language used in 25 U.S.C. § 324.

Piepenbrink Aff. at 1–2. While Mr. Piepenbrink may not be able to bind the Government, his statements can be taken into account when determining the historical position of the agency.

▆▆▆▆ It is not clear when BLM or BIA began to take the position that lessees of mineral rights on split estates had to obtain approval from any tribe holding the surface estate. Clearly that is implicit in the notices plaintiffs received in 1979. But the change apparently did not come about as a result of any public rule making or adjudication that might have highlighted a difference in position. Under the circumstances, the court is reluctant to give much weight to an unarticulated evolution in policy. For the reasons set forth below, the court finds the Secretary's construction of Section 324 to be unreasonable. The court holds that, while the concept of "transfer" is perhaps not at odds with the concept of "granting," the term "grant" used in the statute supposes the creation *ab initio* of an interest in land, not the transfer of an existing interest.[23]

While the TCA gives a tribe the right to veto the grant of a right-of-way,[24] the limited legislative history behind the statute suggests that the more fundamental change intended was to make it easier for the Secretary of Interior to act quickly on behalf of potentially disparate interests in granting new rights-of-way. S.Rep. No. 823, 80th Cong., 2nd Sess. 2 (1948), *reprinted in* 1948 U.S.C.C.A.N. 1033, 1035 (purpose of the act was "to simplify the *granting* of rights-of-way across [Indian lands]" (emphasis added)).[25] The driving force behind the TCA was the inadequacy of existing procedure which often caused "additional expense for the Tribe, [delay in] the processing of applications for rights-of-way, delays [in] the time when the Indians are finally compensated for such rights-of-way, and ... considerable dissatisfaction on the part of both applicants and Indians." *Id.*

While there are no cases specifically addressing the TCA's application to transfers of rights-of-way, the few cases discussing it suggest that its intended operation is with respect to the creation of new interests. In *Coast Indian Community v. United States,* for example, the Court of Claims applied the TCA, and the related regulatory provisions, to a new grant of a timber permit on Reservation land. 213 Ct.Cl. 129, 550 F.2d 639 (1977). The first question the court addressed was whether plaintiffs held a compensable interest in the land at issue. 213 Ct.Cl. at 136, 550 F.2d at 642. After looking at the actions of the individual Indians and BIA's actions with regard to those Indians, the court held that the individual Indians were beneficial owners of the land and were entitled to damages as a result of BIA's failure to obtain consent to the permit from a majority of the adult Indians. 213 Ct.Cl. at 150–51, 550 F.2d at 650–651. Here, while the Tribe may be the beneficial owner of the surface estate, it does not have a compensable interest because, as stated above, the estate it received was already encumbered by the Government's right of access. The tribe lost nothing when the leases were issued.

In *United States v. Mountain States Telephone and Telegraph Company,* the United States brought suit on behalf of the Confederated Salish & Kootenai Tribes against

---

**23.** *Coast Indian Community v. United States,* the only case specifically applying the TCA, involved the express creation of a right-of-way across Tribal land. 213 Ct.Cl. 129, 550 F.2d 639 (1977). Neither the parties, nor the court, could find any additional cases in which the TCA was applied to something other than the creation of a right-of-way. In addition, the problems cited in the Senate Report which the TCA was meant to alleviate all involve the granting, *ab initio,* of new rights-of-way. S.Rep. No. 823, 80th Cong., 2nd Sess. 2 (1948), *reprinted in* 1948 U.S.C.C.A.N. 1033. There is no mention of transfers of existing rights-of-way. *Id.*

**24.** *See supra* note 15.

**25.** The TCA gives the Secretary the power to "grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes...." 25 U.S.C. § 323. The act was originally drafted to simplify the granting of rights-of-way across Osage Indians lands in Oklahoma. S.Rep. No. 823, 80th Cong., 2nd Sess. 2 (1948), *reprinted in* 1948 U.S.C.C.A.N. 1033, 1035. When it became apparent that the new law could simplify right-of-way grants across all Indian lands, the bill was expanded to cover other tribes. *Id.*

Mountain States Telephone & Telegraph Company to prevent the company from installing a telephone cable along a road located within an Indian Reservation without the consent of the Secretary and the Tribes. 434 F.Supp. 625 (D.Mont.1977). The road was already subjected to a right-of-way granted in 1916, prior to the enactment of the TCA. After determining that the interpretation of the extent of the road right-of-way was governed by state law, the court stated that the state could make incidental use of the right-of-way by installing the telephone cable. *Id.* at 627–28 (citing *United States v. Oklahoma Gas & Elec. Co.*, 318 U.S. 206, 63 S.Ct. 534, 87 L.Ed. 716 (1943)). The court then rejected the retroactive application of the TCA to the 1916 grant when it stated, "[i]f the state and its subdivisions were granted a right to make incidental uses of highway rights-of-way in 1916, then the grant is diminished if, by an act passed in 1948 [the TCA], they may not now do so." *Id.* at 629. The application of the TCA to the transfer of a pre-existing implied right-of-way would have a similar effect.

The necessary import of the defendant's position is that a lease cannot be assigned effectively without tribal approval. While the Secretary, acting on his own behalf, can exercise certain prohibitions on transfers under the Mineral Leasing Act, the statutory scheme to which lessees subject themselves presumes an entitlement to assign or sublease.[26] This is in keeping with general principles of oil and gas leasing.[27] It would be a substantial new imposition on lessees to give an absolute veto to a third party, namely the surface-owning tribe.

Since the right-of-way preexisted in the Government, no compensable interest of the Tribe was diminished when the transfer from the Government to the plaintiffs occurred. As the court stated in *Mountain States Telephone*, "[t]here is a difference between the nondamaging use of a right-of-way already removed from the control of the Secretary and the Indian owner and a use which puts a new burden on unburdened lands." *Id.* at 628. Here, the same burden on the surface estate existed after the execution of the subject leases as before. No additional burden arose. The court holds that there was no "grant" within the meaning of the TCA. There was only a transfer of a pre-existing right-of-way. Because that transfer did not create a new burden on Indian lands, the court holds that the leases were not subject to the TCA.

*Right To Challenge Government Action*

■ Defendant next argues that the "takings claim" is fatally flawed. It begins with the proposition that, in order to maintain a takings claim, plaintiffs must concede that the actions of BIA officials in denying access were not unauthorized, i.e., unlawful. Pointing to *Florida Rock Industries v. United States*, 791 F.2d 893, 898˙(Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), and *Langenegger v. United States*, 756 F.2d 1565 (Fed.Cir.1985), *cert. denied*, 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985), defendant argues that if plaintiffs do not make such a concession, then their real demand is for specific relief, namely, to have the court set aside the unauthorized acts of Government officials. That sort of claim, of course, is not cognizable here. *Florida Rock*, 791 F.2d at 899. *See also Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 803 (Fed.Cir.1993). According to defendant, plaintiffs' remedy, at the time one was available, would have been a declaratory judgment action in district court under the Administrative Procedures Act.[28]

Plaintiffs counter that they do not challenge the validity of the BIA's imposition of a requirement to obtain a right-of-way. They contend that they do not have to assume that BLM or BIA acted illegally, but rather, that officials erred in interpreting the law. The result was that plaintiffs' interest in the leases expired, not because of any inherent limitation within those interests, but because of a new imposition. In essence, plaintiffs con-

---

**26.** *See* 30 U.S.C. §§ 187, 187a (1994).

**27.** *See* 3 W.L. Summers *The Law of Oil and Gas* § 541, p. 500 (1956) (In the absence of a contractual or statutory prohibition, "[a]n oil and gas lessee has inherent powers to transfer all or a portion of his interests by assignment. . . .").

**28.** 5 U.S.C. §§ 701–706. *See supra* note 18.

tend that "validity" in a takings context means merely the authority of an official to act and that the actions at issue were valid to that limited extent.

The Government's argument raises a legitimate question: can plaintiffs maintain a takings claim when what really is challenged is the applicability of the TCA to the subject leases. This argument was not adequately addressed by either party in the current motions, however. Fortunately, resolution of the other issues raised in the motions need not await additional development. The court notes, moreover, that even if defendant is correct, only the takings portion of plaintiffs' complaint would be dismissed. The breach of contract claim would appear to be unaffected. Accordingly, the court declines, for the present, to rule on this aspect of defendant's motion. If the Government wishes to pursue this argument it must do so in a separate motion.

## CONCLUSION

Defendant's Motion for Summary Judgment is denied. Because judgment does not necessarily flow from what the court has stated with respect to the points raised in plaintiffs' motion, it is denied without prejudice. The parties are directed to file a joint status report on or before April 19, 1996, proposing further proceedings.