**DEL–RIO DRILLING PROGRAMS, INC., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 569–86L.**

United States Court of Federal Claims.

May 16, 2000.

---

Gerald E. Nielson, Salt Lake City, UT, for Plaintiff.

Thornton Withers Field, with whom was M. Dennis Daugherty, Washington, DC, for Defendant.

### OPINION

BRUGGINK, Judge.

This is an action for breach of contract or, in the alternative, for a Fifth Amendment

taking. The property which is the subject of the claim consists of interests in oil and gas leases. The leases are on the Uintah and Ouray Indian Reservation in central Utah. The matter is currently before the court after a trial, held March 20 and 21 in Salt Lake City, Utah, on the issue of whether the federal government denied the plaintiffs access to the leases at issue here.

Del–Rio Drilling Programs, Inc., ("Del–Rio") and the other plaintiffs allege that the United States, acting through the Bureau of Indian Affairs ("BIA") and Bureau of Land Management ("BLM"), violated the terms of leases by improperly permitting the Ute Indian Tribe ("Tribe") to control physical access necessary to develop the leases.[1] In the alternative, they allege that these actions constitute a taking of their leasehold interests without just compensation in violation of the Fifth Amendment of the United States Constitution.

As a predicate to the resolution of the issue of whether the government, acting with and through the Tribe, denied plaintiffs access, the court hereby reinstates its earlier holding in *Del Rio Drilling Programs, Inc. v. United States*, 35 Fed.Cl. 186 (1996) (*"Del Rio I"*). That opinion was previously withdrawn by *Del–Rio Drilling Programs Inc. v. United States*, 37 Fed.Cl. 157 (1997) (*"Del–Rio II"*). *Del–Rio II*, in turn, was reversed by *Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed.Cir.1998) (*"Del–Rio III"*). The court views one of the necessary consequences of *Del–Rio III* as an instruction that it can adjudicate, as it did in *Del–Rio I*, the legality *vel non* of BIA's and BLM's interpretation of the Tribal Consent Act. Reinstating the opinion is necessary before proceeding further. If the agencies properly viewed the Tribe as having the right to prevent access, then the government was not wrongfully interfering with any property interest or contract right of plaintiffs.

There are two immediate effects of reinstating *Del Rio I*. First, it establishes that the plaintiffs' takings claim did not accrue until, at the earliest, after September 8, 1983. *See* 35 Fed.Cl. at 192. Second, and most importantly for purposes of this opinion, it establishes that, contrary to the position of BIA and BLM, the Tribal Consent Act[2] did not give the Tribe the legal right to stop plaintiffs from accessing their leasehold estates. *See* 35 Fed.Cl. at 193–98.

## FACTS

Between 1968 and 1974, BLM issued several leases to plaintiffs, or their predecessors in interest, which gave plaintiffs subsurface oil and gas mining and development rights in contiguous lands located, in part, on the Uintah and Ouray Indian Reservation ("Reservation").[3] The leases are all of a standard form and give plaintiffs the "exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and gas deposits" located on the lands encompassed by the individual leasehold estates.

In September, 1981, the leases at issue here were compiled into the "Oil Canyon II Unit" ("Unit"). Inclusion of leases within a unit allows all of the leases to continue as long as the unit is in effect, i.e., provided that there is production of oil or gas in paying quantities from a "unit well" prior to the expiration of the leases.[4] 43 CFR § 3107.3–1 (1999).[5] When the unit is terminated, the individual leases are automatically extended for two years. 43 CFR § 3107.4. Most of the leased lands are located on a southern portion of the Reservation known as the "Hill Creek Extension." Del–Rio was the "operator" of the Unit and thus responsible for the

---

1. Both BIA and BLM are divisions of the Department of the Interior.

2. 25 U.S.C. § 323 (1994).

3. Defendant has raised questions regarding the ownership of, and thus the right to pursue claims for compensation for, the leasehold estates involved in this litigation. The court will address that issue at a later date.

4. While there were producing wells within the Oil Canyon II Unit at the time of the events at issue here, those wells were not, for a variety of reasons that the parties do not dispute, "unit wells" sufficient to hold the unit.

5. Citations are to the current regulations unless otherwise indicated.

day-to-day drilling operations on all of the leases within the Unit.

Defendant maintains that only twelve leases are referred to in the complaint and thus those twelve are the only ones properly before the court. Plaintiffs maintain that their claims include additional leasehold estates, located on what the parties refer to as the "Tenneco Farmout." The Tenneco Farmout was encompassed within lease U–46696, and only a portion of it was within the borders of the Unit. The court will not address this issue now, however. It is sufficient that the disputed leases are located within the area to which plaintiffs claim they were denied access.

In the spring and summer of 1982, Del–Rio received the requisite approvals from BIA and the United States Geological Survey (USGS), and began drilling well 26–1A on lease U–10165.[6] Well 26–1A was to serve as the initial unit well for the Unit, and was located just within the borders of the Reservation. Due to a particularly bad winter in 1982–83, Del–Rio did not complete well 26–1A, and it was not put into production in 1982.

On March 25, 1983, Ed Guynn, BLM District Oil and Gas Supervisor, wrote Del–Rio concerning the agenda for an upcoming prestaking conference for four proposed wells on the Tenneco Farmout.[7] His letter, in addition to listing some matters routine to a prestaking conference, stated that: "Cultural, wildlife, T.E. species and access concerns have been raised by the [Ute] Tribe for these locations. A special zoning stipulation has been developed by the Tribe and will be presented at the meeting." Onsite inspections of the proposed drill sites were scheduled for June 23, 1983.

In mid-April, 1983, Del–Rio had a meeting with officials of the Tribe, attended by representatives of both BIA and BLM. At this meeting, Del–Rio learned that the Tribe wanted to interdict or, at the very least,

severely limit, Del–Rio's access to the Hill Creek Extension. Del–Rio was understandably concerned by this development. At the time of the meeting, Del–Rio already had producing wells located on the Hill Creek Extension, was planning on completing well 26–1A in the summer of 1983, when weather permitted, and was seeking to expand its operations into the Tenneco Farmout. Any denial of access to the Hill Creek Extension could only be seen by Del–Rio as a serious threat to its operations.

At the time Del–Rio learned of the Tribe's plans to limit access to the Hill Creek Extension, Del–Rio was beginning to face some significant deadlines. Most of the leases within the Unit were due to expire on June 4, 1983. This meant that Del–Rio either had to establish production on the unit obligation well, 26–1A, thus continuing the terms of all leases within the unit, or find some other way to extend the terms of the leases.

The primary evidence about events in 1983 came from the testimony of plaintiffs Larry Caldwell and Steven Martens. The court found the testimony of these witnesses to be credible, particularly that of Mr. Caldwell. Mr. Caldwell is the founder of Del–Rio and participated in virtually all of the events that form the basis of this lawsuit. Additionally, he has spent his entire adult life in the oil and gas exploration and drilling industry. He communicated regularly with Mr. Guynn, both during and before the events in question. The court found no reason to doubt the substance of his testimony.

In response to the Tribe's position, Mr. Caldwell immediately contacted Mr. Guynn to set up a meeting to seek Guynn's assistance. At that meeting, Guynn told Caldwell, and other principals in Del–Rio, that while he was aware of the Tribe's position, he was powerless to do anything about it; in his view, if Del–Rio was to have access to the Hill Creek Extension, it would have to nego-

---

6. Del–Rio received approval of its Application for Permit to Drill from USGS on April 24, 1982. BIA granted Del–Rio permission to construct access roads and the well site on May 4, 1982. Del–Rio commenced drilling on well 26–1A on June 30, 1982.

7. Three of the four proposed wells (proposed wells 3–1A, 4–1A and 5–1A) were located outside of the boundaries of the Oil Canyon II Unit. It is unknown whether the fourth proposed well (well 34–1A ) would have established the unit. In any event, none of these wells were ever drilled.

tiate such access with the Tribe. Mr. Caldwell testified as follows:

A: The first conversation was a phone call to ask him for an appointment to come and see him. And in the conversation it appeared to me that already, he knew there was a problem as far as access. And so we went to see him at his office.

. . . .

Q: Okay, what was said in that meeting?

A: I asked Mr. Guynn what really was going on. And he said, well, you've been denied access to the Hill Creek Extension. And the gist of the conversation, well what can we do? And where are we right now? He said there is possibilities of trying to work this out to see if it couldn't be.

Q: Did he say anything about investigating the matter further?

A: Yes. He said he would try to find out the extent and if there was anything to be done to work it out with the tribe for access.

. . . .

Q: Your subsequent meetings with Mr. Guynn—

A: Yes, sir, there were—

Q: —did you meet with him again and did he tell you he had done some investigation?

A: Yes.

Q: And what did he tell you he found out?

A: He said you don't have any access to those leases.

Tr. at 58–60. According to Steven Martens, Mr. Guynn was adamant that Del–Rio had no access to the Hill Creek Extension:

And [Guynn] said you cannot go out there [to the Hill Creek Extension]. And I remember how he said it because he brought up the fact about the gate and the armed guards and everything are out there. You cannot go out there. Not to produce your wells, or to, you know, babysit the equip-

ment or anything like that. We were just told not to go out there.

Tr. at 205.

According to Larry Caldwell, Guynn suggested that Del–Rio apply for a Suspension of Operations (SOP) of all of the leases not then in production. An SOP suspends the running of the term of a lease. 43 CFR § 3103.4–2(b) (1983). Del–Rio followed this advice, noting in its application for the SOP that it sought such relief due in part to uncertainty about obtaining access from the Tribe. The SOP was granted on June 14, 1983, retroactively effective to May 1. It was set to expire on September 1, 1983 or such earlier date as an Application for Permit to Drill (APD) on the suspended leases was rejected or actual drilling commenced. The SOP allowed Del–Rio to save its leases.

On June 22, 1983, Del–Rio received written notice from Dean Evans, a BLM area manager, that the June 23 onsite inspections in the Tenneco Farmout were cancelled and would not be rescheduled. As reason for the cancellation, Evans stated that a recent meeting of the Ute Tribal Council had resulted in the drafting of ordinances [8] which sought to "establish a preservation area for Ute Wildlife, Cultural and Religious resources in the area and declare a moratorium on all new development in the Hill Creek Extension."

On July 14, 1983, the Tribe adopted Resolution No. 83–184, which states, in relevant part, that:

[T]he Tribe hereby refuses to grant nor give permission to the Secretary of the Interior or his delegate to grant or approve, any easement surface lease, or right-of-way relative to mineral exploitation and/or roadway construction within that portion of its reservation . . . commonly known as the "Hill Creek Extension."

The Resolution further states that BIA is to return any application for any of the above outlined activities, "accompanied by a statement that the Tribe refuses to consent to such request, and, as such the Bureau of

---

8. It does not appear that any such Tribal ordinance was effective as of the date of this communication by BLM.

Indian Affairs is powerless to grant the sought after land request."

Throughout the summer of 1983, Del–Rio continued to attempt to negotiate some form of access agreement with the Tribe, but to no avail. Mr. Guynn suggested that, in order to save the leases, Del–Rio apply for an indefinite SOP. Del–Rio followed this advice, and on August 31, 1983, Guynn granted the indefinite SOP. In his letter to Del–Rio Guynn noted that "the suspension is necessitated because of the restrictive measures imposed by the Ute Indian Tribe Resolutions denying access to the [Oil Canyon II] Unit across Tribal land." The letter also noted that the prior SOP was due to expire the next day, and that nine of the leases within the unit would terminate with the expiration of the SOP.[9]

On September 8, 1983, Kenny Cuch, Acting Superintendent, BIA, wrote Del–Rio regarding pending applications for rights-of-way into the Hill Creek Extension:

> The Ute Tribe by Resolution 83–184, has denied any access into the Hill Creek area [parenthetical omitted]. Consequently, this office considers all of those applications previously submitted for rights-of-way in this area as void. Until such time as these restrictions are lifted, new applications for rights-of-way in this area will not be accepted.

While Del–Rio knew that the Tribe had been considering such action, this appears to be the first time Del–Rio learned that any such ordinance had been enacted. As a consequence, Del–Rio contacted BIA for more information. Allan Core, Superintendent, BIA, sent Del–Rio another letter accompanied by a copy of Resolution 83–184 on September 13. Although the September 8 letter referred to a denial of "any access," the later letter stated that "[t]he [Tribe's] resolution pertains to future grants of rights-of-way and

does not effect existing rights." As Mr. Caldwell testified, the September 13 letter contradicted what Mr. Guynn told them:

> Q: Was the [September 13, 1983 letter] contrary to the advice that you received from Mr. Guynn?
>
> A: Yes.
>
> Q: And did you believe the advice you received from Mr. Guynn?
>
> A: Yes.
>
> Q: And did Guynn in fact instruct you not to go in [the Hill Creek Extension]?
>
> A: Yes, he did.
>
> Q: To produce your wells, to retrieve your equipment, for any reason?
>
> A: We had no right to go in there at all.
>
> Q: But he [Guynn] told you that?
>
> A: Yes.

Tr. at 76.

On December 14, 1983, Acting Superintendent Cuch again wrote to Del–Rio, in reference to a Notice of Intent to Drill filed by Del–Rio late in 1983 regarding a proposed well on some of the lands leased from the State of Utah.[10] This letter repeats the language of Cuch's September 8 letter:

> By letter dated September 8, 1983, your company was notified by this office that the Ute Tribe had passed a resolution denying any access into the area (Hill Creek) which you are now seeking to enter. This resolution has not been rescinded and the same restrictions remain intact.

The next communication Del–Rio received from defendant was a letter from BIA Superintendent Core on February 28, 1984, informing Del–Rio that BIA was recommending to BLM that leases U–10166 and U–019837 be terminated for failure to obtain right-of-way

9. The following leases had an expiration date of June 4, 1983: U–6610, U–6612, U6632, U–6634, U–10162, U–10163, U–10164, U–10165, and U–18726. U–27043, which was covered by both the June 14 and August 31 SOP orders, had an expiration date of October 31, 1984. The plaintiffs' remaining federal leasehold interests, leases U–10166 and U–019837, were held by production and were not in danger of expiring.

10. These lands are referred to by the parties as the "State School Leases." The Notice of Intent to Drill referred to in the December 14 Cuch letter was not produced by the parties, nor could the court find a copy of it in any of the documents previously produced by the parties during the course of this litigation. The court accepts the testimony, unchallenged by the defendant, as to the subject matter of the Notice of Intent.

and well pad easements from the Tribe.[11] Larry Caldwell testified that this was the first Del–Rio knew of a need to obtain such easements from the Tribe.

Del–Rio continued its attempts to negotiate an access agreement with the Tribe throughout 1984 and 1985, but was unsuccessful. During this time, as a result of the Tribe's resolution, the letters from BIA, and the advice of Mr. Guynn, plaintiffs did not enter the Hill Creek Extension. They effectively abandoned all of the drilling and well equipment they had in place on the Hill Creek Extension.

In June 1985, plaintiffs' counsel wrote BLM and BIA to again seek government intervention on Del–Rio's behalf, and to express his clients' frustration with their continued inability to gain surface access to the leasehold estates. The letter also mentioned that Del–Rio was contemplating suing the federal government over the access question. Responding to this letter, James Stevens, Area Director for BIA, wrote:

> We can quite candidly tell you that the BIA is not adverse to trying to assist your clients in resolving the problem; however, if the Ute Tribe is taking a hard stand on this issue, in conformance with its constitutional powers, there is little we can do to help. By the same token, it may be difficult to attempt to hold [BIA] legally responsible for tribal council actions over which [BIA has] no administrative control.

On March 11, 1986, Howard Lemm, Mr. Guynn's replacement as Chief, Branch of Fluid Minerals in the BLM's Vernal Field Office, wrote to Del–Rio cancelling the indefinite SOP granted by Ed Guynn in 1983. His letter stated that it was "not in the public interest to allow this SOP to remain in effect since the problems involved are between you and a private entity," referring to the access dispute between Del–Rio and the Tribe. The letter went on to state that the SOP for Oil Canyon II Unit would terminate July 1, 1986. It further noted:

> You are reminded that you will then have until August 4, 1986, to establish production of oil and/or gas in paying quantities or the majority of the leases in the Oil Canyon II Unit will expire.

The SOP was eventually extended to January 1, 1987, after Del–Rio maintained that surface-access negotiations with the Tribe were showing progress. However, BLM advised Del–Rio in its August 8, 1986 letter granting the extension of the SOP, that no further extensions of the SOP would be granted beyond the January 1 expiration date. Del–Rio filed this lawsuit on September 11, 1986.

The SOP expired on January 1, 1987, and thus the lease terms began to run once again. Del–Rio still had not obtained a surface-access agreement from the Tribe. On January 29, 1987, Del–Rio requested, and was granted, termination of the Oil Canyon II Unit. BLM, in accordance with 43 CFR § 3107.4, automatically extended by two years the terms of the leases affected by the SOP.

On October 2, 1987, Del–Rio and the Tribe entered a surface-access agreement with the Tribe. In exchange for access to the Hill Creek Extension, Del–Rio gave the Tribe, among other things, a five percent overriding royalty interest in any of the wells located on the Hill Creek Extension. According to Larry Caldwell, other than a single short trip to check on equipment, this was the first time the leaseholders or operators had been on the Hill Creek Extension in the four years after the Tribe passed the Resolution.

However, other than the already-existing producing wells,[12] Del–Rio did not, because of financial difficulties, conduct any further development on the Hill Creek Extension once it negotiated access. The prospective well sites that existed in 1983 were abandoned.

Lease U–18726 expired June 1, 1988, and lease U–27043 expired November 1, 1988, both for failure to make annual rental payments. Similarly, leases U–10162 and U–10163 expired December 1, 1988 because

---

**11.** As noted earlier, *see supra* n. 9, these were the only two federal leases that Del–Rio held by production during this time period.

**12.** There are two wells (wells 30–1 and 30–2A) located on lease U–019837 and one well (well 29–1A) located on lease U–10166.

1988 rental payments were not made. Leases U–6610, U–6612, U–6632, U–6634, U–10164 and U–10165 expired on January 29, 1989, for lack of production in commercial quantities or drilling over the term of the leases. Leases U–019837 and U–10166 are currently still held by production.

## DISCUSSION

The Tribe did not possess the legal authority to exercise a veto over plaintiffs' access to their leasehold estates on the Hill Creek Extension. *See Del–Rio Drilling Programs, Inc. v. United States,* 35 Fed.Cl. 186, 197 (1996) ("Since the right-of-way [to the leased lands in the Hill Creek Extension] preexisted in the government, no compensable interest of the Tribe was diminished when the transfer from the government to the plaintiffs occurred."). Plaintiffs' contend that the government effectively gave the Tribe such a veto, and thus bears responsibility for any interference with access.

There is no question that the agencies took the position that the Tribe had the right to control access to the well sites. The agencies required, through interlocking regulatory approvals, that the plaintiffs obtain access rights from the Tribe. The court has also found credible plaintiffs' assertion that Ed Guynn ordered Del–Rio not to enter the Hill Creek Extension until it had obtained approval from the Tribe. The court agrees that those "orders," together with the BIA letters of September 8 and December 14, 1983, amounted to a government direction to stay off the Hill Creek Extension.

Defendant urges the court not to take into account what Mr. Guynn "ordered" the plaintiffs to do, basing its objection on 30 CFR § 221.12 [13] ("The Supervisor may issue written or oral orders to govern specific lease operations. Any such oral orders shall be confirmed in writing by the Supervisor within 10 working days from issuance thereof."). Because Mr. Guynn made no written confirmation, defendant argues, there was no valid

order. This same argument was rejected in earlier denials of defendant's motion in limine. *See* Orders of January 19 and March 6, 2000. We explained then that defendant was asking the court to punish plaintiffs for the government's failure to abide by its own record keeping requirements; we see no legal or equitable reason to do so. The regulation is directed at what the agency should do for its own record keeping purposes. The government cannot create a defense based on its own neglect. Moreover, there is no question that Mr. Guynn was authorized to represent the United States with respect to these leases, and that he could give oral directions. Finally, the letters of September 8 and December 14, 1983, satisfy any need there might be for written confirmation.

Guynn was the BLM official in direct charge of the leases at issue and he clearly told the plaintiffs that they could not access the leaseholds. The fact that Guynn apparently disagreed with the Tribe's position and tried to help plaintiffs does not alter the result. When Guynn told the plaintiffs not to go into the Hill Creek Extension, he was acting within the scope of his authority. He therefore put the force of the United States behind the Tribe's directive. As the BLM official in charge of administering the leases, plaintiffs were certainly reasonable in following Guynn's orders, even if they disagreed with the government's understanding of the law. The net effect is that it was the government, and not merely the Tribe, that denied plaintiffs access to their leasehold estates.

Defendant contends, however, that it never denied a single request for any necessary permit or right-of-way, and that Del–Rio had all of the approvals necessary to continue its drilling operations, especially with respect to 26–1A, the key unit well. Defendant argues that the BIA letter of September 13, 1983, would appear to have been the answer to plaintiffs' problems; it can fairly be read to tell plaintiffs that, insofar as they already had the necessary approvals to complete well

---

**13.** 47 Fed.Reg. 47768 (1982). 30 CFR § 221.12 was deleted when the Department of Interior's regulations were redesignated to reflect the consolidation within BLM of all responsibility for onshore Federal and Indian oil and gas leases. 48 Fed.Reg. 36582 et seq. (1983). Several facets of section 221.12 were incorporated, however, into the new 43 CFR § 3161.2 "Responsibility of the authorized officer." *See* 48 Fed.Reg. 36584.

26–1A, which they in fact did, they were free to proceed.

When viewed in light of the other communications with the government, and in light of the Tribe's later insistence on payment of royalties on all wells, including existing wells, this letter cannot be taken at face value. Both the BIA letters of September 8, and December 14, 1983, plainly state that the Tribe is denying "*any* access into the Hill Creek area." *See* Plaintiffs' Exhibits 5, 8 (emphasis added).[14] The plaintiffs' interpretation of the September 13 letter is reasonable; they viewed that letter as a single, contrary communication, outweighed by a sizable body of evidence that the government endorsed the Tribe's denial of access to the Hill Creek Extension. Indeed, BIA's position in this respect was reaffirmed in a 1985 letter to plaintiffs' counsel which states, in pertinent part:

> We can quite candidly tell you that the BIA is not adverse to trying to assist your clients in resolving the [access] problem; however if the Ute Tribe is taking a hard stand on this issue, in conformance with its constitutional power, there is little [BIA] can do to help.

Other arguments defendant makes are irrelevant to the access issue. For example, defendant points out in its post-trial brief that after Del–Rio and the Tribe negotiated access in 1987, Del–Rio did not develop the leases. Therefore, it argues, losing the leases was Del–Rio's fault. The non-development of the leases *after* 1987 is irrelevant to the question of denial of access *before* 1987. The court has limited its present inquiry to the narrow factual question: did the government deny plaintiffs access to the Hill Creek Extension? It is persuaded, from the evidence at trial, that it did. The legal consequences of that conduct remain to be addressed.

Defendant also argues that the government should not be held responsible for actions of to the Tribe. We disagree. A very

similar argument was addressed in *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed.Cir.1990). There the plaintiff possessed leases which allowed it to mine uranium on lands within the Navajo Reservation. The plaintiff submitted a mining plan which satisfied all applicable federal regulations, yet the Secretary of the Interior refused to approve the plan, and thus to allow the plaintiff to begin mining, unless it was approved by the Navajo Tribe. The Navajo tribal council withheld approval, and eventually the plaintiff's leases expired for lack of production. *See id.* at 1433. At the time, Tribal approval of a mining plan was not, and had never been, required. *Id.* at 1434. The Federal Circuit held that the Secretary's actions effectively gave the Navajo Tribe a unilateral veto over the plaintiff's mining plan and constituted a taking.

The present circumstances are not materially different. As in *United Nuclear,* the government here gave the Tribe the right to unilaterally control plaintiffs' access to their leasehold estates.

The plaintiffs have shown that they were denied access to these leases because of government conduct. Unfortunately, this decision does not signify the end of this already-lengthy litigation. Defendant's affirmative defense of alternate access now becomes relevant, as does the defendant's challenge to the ownership rights of individual plaintiffs and its assertion that plaintiffs' voluntarily gave up the leases. The parties are thus directed to file a joint status report on or before June 15, 2000 proposing a schedule for resolution of these issues.

---

14. The court notes that the access agreement ultimately reached between Del–Rio and the Tribe gave the Tribe an overriding royalty from all oil and gas extracted from the Hill Creek Extension. This is, at the least, circumstantial evidence that the Tribe intended to deny access to the entire Hill Creek Extension, and not just to areas in which applications for rights of way had not yet been granted.