DEL–RIO DRILLING PROGRAMS, INC., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 569–86L.

United States Court of Federal Claims.

Jan. 15, 1997.

Gerald E. Nielson, Salt Lake City, Utah, for plaintiffs.

Lewis S. Wiener, Department of Justice, Environment and Natural Resources Division, with whom was Thornton Withers Field, both of Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This is an action for a Fifth Amendment taking, or, in the alternative, for breach of contract. Plaintiffs contend that the Government either breached the oil and gas leases it executed with plaintiffs or their predecessors in interest, or that the Government's actions here resulted in a taking of their leases. The matter is presently before the court on the parties' renewed cross-motions for summary judgment. Oral argument was heard on December 19, 1996, in Washington, D.C. For the reasons set forth herein, defendant's motion is granted.

### Procedural Background

This case was transferred to this judge in January, 1994. In March, 1994, the Government's motion to dismiss, grounded on passage of the limitations period, was denied. The parties then filed cross dispositive motions. The Government renewed its argument that the action was untimely and also argued that a key assumption behind plaintiffs' claim was incorrect—namely, that the Tribal Consent Act, 25 U.S.C. §§ 323–28 (1994) ("TCA"), did not affect the estates at issue. The plaintiff cross-moved for summary judgment on the question of the applicability of the TCA to the subject leases. The court's order of March 15, 1996, denied the parties' cross-motions for summary judgment. The court once again ruled that the action was not untimely, but it did hold that the TCA did not apply to the subject leases. *Del Rio Drilling Programs, Inc. v. United States,* 35 Fed.Cl. 186, 188–91 (1996). The court did not find for the plaintiffs on liability, however, because it preserved the question of whether the plaintiff can maintain a taking claim at all if the substance of the complaint is that the Government's conduct was unlawful. The court invited a renewed motion for summary judgment to address that question.

The defendant has filed a renewed motion for summary judgment, although it goes be-

yond the issue identified earlier. The Government once again asserts its twice-denied defense of the running of the limitations period. The court will not reconsider that question here. The motion broadens the issue identified in the opinion, however, to assert that, under either a breach of contract or takings theory, the action impermissibly draws into question the legality of agency conduct. Plaintiffs' motion once again seeks partial summary judgment on liability. The relevant facts have not changed since the earlier opinion; rather, it is the legal arguments espoused by the parties that have evolved significantly. Nevertheless, the basic facts are briefly set forth below. For convenience, the plaintiffs will be referred to collectively through the lead plaintiff, Del–Rio Drilling Programs, Inc. ("Del–Rio").

*Factual Background*

Prior to 1948, the United States owned certain land bordering or near the Uintah and Ouray Indian Reservation ("Reservation") in the State of Utah. By an act of Congress, in 1948 the United States divided its fee simple interest in this land into separate surface and mineral estates. Act of March 11, 1948, Pub.L. No. 80–440, 62 Stat. 72 (1948) ("the Act"). Title to the surface estate was transferred to the United States as trustee for the Ute Indian Tribe. The surface estate was to form the "Hill Creek Extension" of the Reservation. However, the Act reserved the mineral rights in the affected land to the United States outright, rather than as trustee. Subsequently, pursuant to the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181–287 (1994), the Government, acting through what is now the Bureau of Land Management (BLM),[1] made these mineral rights available for leasing by private concerns. The plaintiffs or their predecessors in interest obtained leases on tracts consisting both of split estates, in which the surface is owned by the tribe, and unified estates, in which the Government retained ownership of the surface.

The leases that are the subject of the present action were identical in relevant respects. Each provided:

The lessee is granted the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and gas deposits, except helium gas, in the lands leased, together with the right to construct and maintain thereupon, all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment thereof, for a period of 10 years, and so long thereafter as oil and gas is produced in paying quantities; subject to any unit agreement to govern the lands heretofore and hereafter approved by the Secretary of the Interior, the provisions of said agreement to govern the lands subject thereto where inconsistent with the terms of the lease.

The leases also provided that:

[Lessee] hereby offers to lease all or any of the lands described in item 2 that are available for lease, pursuant and subject to the terms and provisions of the Act of February 25, 1920 ... and to all reasonable regulations of the Secretary of the Interior now or hereinafter in force, when not inconsistent with any express and specific provisions herein, which are made a part hereof.

Pursuant to its regulatory authority, the BLM requires that all who lease mineral rights on public lands submit and obtain approval of an Application for Permit to Drill (APD) before actually drilling or surveying for the minerals covered by the leases. 43 C.F.R. § 3162.3–1(c) (1996).[2] The BLM approved Del–Rio's first such APD on December 20, 1979. This APD was approved with the following condition: "Permits for road rights-of-way and drilling pads have not been

---

1. The Bureau of Land Management is a division of the Department of the Interior charged by the Secretary of the Interior with the responsibility for issuing oil and gas leases for public lands. *See* 235 DM 1.1K (Department of the Interior Departmental Manual). The Secretary of the Interior's authority derives directly from the Mineral Leasing Act of 1920. 30 U.S.C. § 226(a).

2. The source cited is current, however, this same requirement was in effect at all times relevant to the plaintiffs' claims.

applied for from BIA. Where the Ute Tribe does not own the minerals, these ... must be acquired before drilling." The reference to the BIA is to the Bureau of Indian Affairs, a sister bureau to the BLM within the Department of Interior. BIA carries out numerous statutory responsibilities for the Government in its role, among others, as trustee of Indian lands. Obtaining tribal/BIA approval as a condition for the approval of the APDs was reiterated by the BLM in subsequent APD's: "Del–Rio must have an approved right-of-way from the Ute Tribe before operations start."

The plaintiffs did not make any formal objection to the BLM's insistence that easements be obtained from the tribe through the BIA. Instead, plaintiffs paid the Ute Tribe for such easements between 1979 and 1983. However, in late 1982, the Ute Tribe began expressing its opposition to any development of mineral leases in the Hill Creek Extension area. In 1983, the Tribal Business Committee of the Ute Tribe passed a resolution providing, in part, that, "[T]he tribe hereby refuses to grant, nor give permission to the Secretary of the Interior or his delegate to grant or approve, any easement, surface lease, or right of way relative to mineral exploration and/or roadway construction within ... the 'Hill Creek Extension.' "

The BIA notified Del–Rio of the tribe's action in a September, 1983, letter stating, in part, the following:

> The Ute tribe ... has denied any access into the Hill Creek area.... Consequently, this office considers all those applications previously submitted for rights-of-way in this area as void. Until such time as these restrictions are lifted, new applications for rights-of-way in this area will not be accepted.

In a letter dated February 28, 1984, the BIA wrote Del–Rio that the tribe still had not consented to the easements needed to access the drilling sites. It reminded Del–Rio of the necessity to obtain the easements pursuant to the TCA. The BIA "referred"

the matter to the BLM with a recommendation that that entity terminate the affected leases for non-compliance with the terms of the APD.

Instead of terminating the leases, the BLM granted Del–Rio's applications for a Suspension of Operations and Production (SOP) on the leases affected by the BIA's position, citing the "restrictive measures imposed by the Ute Indian Tribe resolution denying access to the unit across Tribal land." BLM later re-issued the SOP's, but on March 11, 1986, notified Del–Rio that it had to establish production or risk expiration of the leases. Subsequent exchanges of correspondence resulted in expressions of sympathy from the BIA, but no alteration in its view that the tribe had the right to deny access pursuant to the TCA.

In 1986, Del–Rio initiated the present action, claiming that its property had been taken without compensation in violation of the Fifth Amendment, or that the Government had breached the lease by not fulfilling the implied contractual duty of furnishing "quiet enjoyment." On October 2, 1987, the Ute Tribe and Del–Rio entered into a surface access agreement for the affected leases. When asked by the court during oral argument why production did not commence at that time, counsel for Del–Rio represented that a "unitization" agreement had lapsed, making it prohibitively expensive separately to establish production in all the individual leases.[3] By January, 1989, all the subject leases had expired without producing paying quantities of oil or gas.

### Discussion

■ Del–Rio has pleaded in the alternative a breach of contract or a taking. Normally, claim analysis should proceed first on the non-constitutional ground. Because the Government seeks to dismiss the entire case, however, its defenses must apply to both theories of liability. Two arguments remain in defendant's motion for summary judgment. Both are framed as attacks on the

---

**3.** A unitization allows groups of individual leases to be operated jointly, as if they were a covered by a single lease. 30 U.S.C. § 226(m). The "Oil Canyon II" unitization agreement was voluntarily terminated at Del–Rio's request on January 30, 1987. This termination had the effect of extending the underlying individual leases for an additional two years. See 43 C.F.R. § 3107.4.

court's subject matter jurisdiction over either the contract or takings claims:

A. Plaintiffs having not administratively challenged the Government's determination that plaintiffs had no implied easements and that rights of way were required, nor sought judicial review under the Administrative Procedures Act in federal district court, the Government's determinations on those matters are a given here.

B. To the extent plaintiffs challenge the legality of the requirement that they obtain rights of way, such claims are due process claims not properly before this court.

The court will not try to resolve whether these defenses are truly challenges to this court's jurisdiction or if they merely question whether the complaint states a claim. A contract and a taking are plausibly pleaded.[4] In some cases in this court, and this is one, the distinctions between lack of subject matter and failure to state a claim approach the metaphysical. For the reasons set out below, the court holds that the taking count fails to state a claim, and the contract count fails for lack of jurisdiction.

The two defenses are difficult to distinguish. They share a single factual predicate, however, namely, that Del–Rio has not challenged previously the validity of the agency's actions, as well as a legal predicate, namely, that it was obligated to do so. For purposes of either its contract or takings claim, the arguments go, Del–Rio must concede that what the BIA and BLM did or did not do was not "invalid."

▮▮▮ This argument is familiar in a takings context. The person claiming that his property was "taken" in a constitutional sense must be prepared to allege that the Government is not acting in violation of any law other than the failure to pay compensation called for by the Fifth Amendment. *See*

*Florida Rock Ind. v. United States,* 791 F.2d 893 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). The reason this is so is that the takings clause assumes that the Government, acting in its sovereign capacity, has invoked its inherent powers of eminent domain to take private property for public use. An "inverse" condemnation action simply alleges that the Government has refused to pay for the privilege. If the action is legally vulnerable for some reason, for example because the Government's agents acted without authority, or because the sovereign power was improperly exercised, the preferred remedy should be to reverse the action. The Government should not be forced to buy private property if its agents act without authority, or, if merely perfecting the particular way power was exercised obviates any claim for relief. If the Government has acted under a misconception of its legal rights or obligations, the better alternative is thus to attempt to restore the status quo. *See generally Crocker v. United States,* 37 Fed.Cl. 191 (1997). Only if the action is "valid," i.e., unassailable on some independent constitutional, statutory, or procedural ground, should the Takings Clause be implicated.

This court has already ruled that the BIA and the BLM erred as a matter of law in giving a "veto" over access to Del–Rio's mineral leases to the tribe in reliance on the TCA. The court held that the legislation does not give Indian tribes powers over property they do not own. *Del–Rio,* 35 Fed.Cl. at 196–97. The severance of the mineral estate, along with the concomitant right of access, created an estate in land independent of the tribe's surface estate. Conditioning an APD on gaining an additional right of way from the tribe, the court held, was thus not required by the TCA.[5] *Id.* It is difficult at this stage for Del–Rio to argue that this

4. It is sufficient to frame the pending legal issues that Del–Rio has alleged that the combined actions of the BIA and the BLM resulted in its inability to access its leaseholds, thereby precluding production and leading to expiration of the leases.

5. This is not to say that a surface owner may have no enforceable interests in how the mineral estate is exploited, or that, in this case, it was improper for the BIA to instruct Del–Rio to negotiate with the tribe. The court merely held that a refusal to permit drilling because of a perceived right in the tribe to bar access was not permissible under the TCA.

holding was not a necessary part of its case. It made this contention the sole basis for its own prior motion for partial summary judgment. The test for this proposition is simple. If the bureaus correctly construed the TCA, then the leaseholds were indeed subject to the tribe's exercise of veto powers. In conditioning an APD on obtaining access, in other words, the BLM and the BIA would not have deprived Del–Rio of a property interest. The leases would have been encumbered from the outset by the need to get tribal consent.

It follows that, given the Government's reliance on the TCA, it would be necessary, in ruling in favor of Del–Rio on its taking claim, to hold that the actions of the BIA and BLM were not in accordance with law. Del–Rio contends, however, that this is not the precise inquiry envisaged by the discussion above. It contends that it is enough, for purposes of conceding the validity of government action, to admit only that the bureaus were acting within the general scope of their statutory powers to issue or deny APD's (BLM) and to act as trustee for the tribe (BIA). They were not, in other words, acting *ultra vires*.

There is support for that narrower view of the inquiry.[6] Adopting it, however, would defeat the rationale expressed in *Florida Rock*, at least when the agency action occurs in a highly regulated context.[7] That case involved a denial by the Corps of Engineers of a permit to dredge and fill. As the Federal Circuit explained, the question before the Claims Court was not whether the permit denial was warranted as a matter of pollution control. If it were, "[i]t would support either a dismissal of the complaint or a transfer of the case to a court having [Administrative Procedure Act (APA)] ... jurisdiction.... [T]he election of a Tucker Act suit, without a

previous test of the validity issues under the APA, accomplishes the same result because of the necessity of conceding the engineers' authority to act." *Florida Rock*, 791 F.2d at 899. A fair reading of this decision suggests that the court was using the term "authority" to mean something more than simply the powers of employees to bind the Government to acts taken within the line and scope of their general statutory duties.[8] The court was obviously suggesting that a claimant had to concede that, under the regulatory regime involved, the denial was not, as a matter of law, invalid for any reason. The rationale would seem to be clear: if there are statutory or regulatory guidelines to test agency conduct, then a taking claim should not lie if the real challenge to the conduct is that the guidelines were violated.

Here, the gravamen of the complaint is that the BLM, acting in its regulatory capacity, erred in conditioning exercise of the APD's on obtaining tribal consent. *Florida Rock* dictates that the validity of that condition must be assumed. At that point, the taking claim disappears.

■ The same analysis is fatal to the contract allegation. Although leases partake of all the relevant characteristics of contracts, it would be unrealistic to evaluate the present facts through a contract prism. The lease, in short, is really part of a much broader statutory scheme that is implemented and enforced by the BLM acting in its regulatory capacity. An allegation that the agency "breached" the lease by failing to ensure access is really a challenge to the BLM's interpretation of the TCA in fulfillment of its statutory duties to enforce the leasing regulatory scheme.

Congress has established the district courts as the proper fora for hearing such

---

6. *See Froudi v. United States*, 22 Cl.Ct. 290, 297–98 (1991).

7. The court merely notes, in passing, that taking actions based on physical invasions may be subject to a different analysis. Although Del–Rio's taking claim could be characterized as one for denial of physical access, the governmental action at issue was regulatory.

8. Takings claims were originally seen as condemnations that were legislatively authorized but for

which payment was not made, merely impliedly promised. *See United States v. North Am. Co.*, 253 U.S. 330, 333, 40 S.Ct. 518, 519, 64 L.Ed. 935 (1920). "In order that the Government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power." *Id.*

challenges to final agency action under those courts' general federal question jurisdiction and the APA. *See* 28 U.S.C. § 1331 (1994); 5 U.S.C. § 702 (1994). Although the remedy afforded will not, absent some special provision, include payment of money damages, *see* 5 U.S.C. § 702, the district courts have broad equitable powers, including issuance of injunctions or declaratory judgments. There can be no real question that Del–Rio had the option to pursue an administrative appeal, either, in the case of the BLM, to the Department's Office of Hearings and Appeals,[9] or, in the case of the BIA, to an Area Director or the Commissioner of Indian Affairs.[10] If dissatisfied with the result, it could then have challenged that action in a district court.

If Del–Rio had earlier sought to reverse the agencies' positions directly or in district court, its present predicament could have been avoided. Its need for a money remedy is, therefore, self-induced. In *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Court emphasized that the Tucker Act remedy is for money, not for traditional equitable remedies. By delaying its suit and electing to come to this more limited forum, however, Del–Rio would, in effect, have achieved what would otherwise not be available here, a declaratory judgment. As the Supreme Court taught in

*United States v. King,* 395 U.S. 1, 3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1968), albeit in a different context, "This is essentially equitable relief of a kind that the Court of Claims has held throughout its history ... that it does not have the power to grant." The court is persuaded that this suit constitutes an impermissible attempt to avoid the limitations of the Tucker Act.

### Conclusion

In retrospect, the court should not have ruled on the previous cross motions for summary judgment. Rather than arguing that its actions were "valid," the Government should have been arguing that the question of invalidity, a necessary component of Del–Rio's claim, was not properly before the court. The opinion of March 15, 1996, is, therefore, withdrawn. Plaintiffs' motion for summary judgment is denied. Defendant's motion for summary dismissal is granted for failure to state a claim. No costs.

---

9.   43 C.F.R. Part 4 (1983).

10.   25 C.F.R. Part 2 (1983).