DEL–RIO DRILLING PROGRAMS INC., Western United Mines, Inc., Syndicators, Inc., Del–Rio Resources, Inc., Hiko Bell Mining & Oil Company, Oil Canyon Fund # 1, 1979–2, 1979–1, Cherokee Trading Company of Olney, Illinois, Dimark Inc., BGS Energy, Non–Ferrous Metal, Sunstone Energy, Inc., Interstate Solar Futures, Inc., Gerald Arndt, Joel Dangerfield, Trustee for TWT Exploration, Inc., Steven D. Martens, Lawrence C. Caldwell, J.R. Kirk, Jr., Amaron Oil Corporation, Ed Ledder, Pioneer Oil & Gas, Inc., B. Lee Waldram, Carl Webster, and Robert F. Deike, Plaintiffs–Appellants,

and

Mono Power Company and 1980–1, Plaintiffs,

v.

UNITED STATES, Defendant–Appellee.

No. 97–5055.

United States Court of Appeals, Federal Circuit.

June 18, 1998.

Gerald E. Nielson, Law Office, Salt Lake City, UT, argued, for plaintiffs–appellants.

John T. Stahr, Appellate Section, Environment & Natural Resources Div., Dept. of Justice, Washington, DC, argued, for defendant–appellee. With him on the brief were Lois J. Schiffer, Asst. Atty. Gen., Robert L. Klarquist, Appellate Section, Lewis S. Wiener and Thornton W. Field, Gen. Litigation Section.

Before CLEVENGER, Circuit Judge, SMITH, Senior Circuit Judge, and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

Del–Rio Drilling Programs, Inc., and the other named appellants (collectively "Del–Rio") filed a complaint in the Court of Federal Claims seeking to recover $17,000,000 from the United States. Del–Rio asserted that the government, acting through the Bureau of Land Management (BLM) and the Bureau of Indian Affairs (BIA), prevented Del–Rio from making beneficial use of mineral leases that the BLM had conveyed to Del–Rio. The government's conduct, Del–Rio charged, constituted a breach of its contractual obligations under the leases and a taking of Del–Rio's property for public use without just compensation. The Court of Federal Claims dismissed both counts of Del–Rio's complaint. *Del–Rio Drilling Programs, Inc. v. United States*, 37 Fed. Cl. 157 (1997). We reverse the dismissal of the complaint and remand for further proceedings.

## I

The pertinent facts are not in dispute. Until 1948, the United States owned certain land near the Uintah and Ouray Indian Reservation in eastern Utah. In that year, Congress extended the boundaries of the reservation by ceding some of the public lands in the area to form what was referred to as the Hill Creek Extension. Congress did not transfer all rights in the Hill Creek Extension, but instead divided its interest in the property into separate surface and mineral estates. Title to the surface estate was transferred to the United States as trustee for the Ute Indian Tribe, while title to the mineral estate remained with the United States.

The BLM subsequently made the mineral rights in the Hill Creek Extension available for leasing by private parties, and Del–Rio purchased leases in that area. Each lease gave Del–Rio the right "to drill for, mine, extract, remove, and dispose of all the oil and gas deposits, except helium gas, in the lands leased, together with the right to construct and maintain thereupon, all works, buildings, plants, waterways, roads," and other structures "necessary to the full enjoyment" of the leases. The leases were also subject to "all reasonable regulations of the Secretary of the Interior now or hereinafter in force, when not inconsistent with any express and specific provisions herein."

By regulation, the BLM required owners of mining leases on federal land to secure special permits before drilling or surveying on the land covered by the leases. The BLM approved Del–Rio's first permit application on December 20, 1979, subject to the condition that before drilling Del–Rio obtain rights-of-way over the trust lands.

Between 1979 and 1983, Del–Rio satisfied the rights-of-way condition by obtaining easements over the trust lands from the Ute Indian Tribe. In 1982, however, the Tribe expressed its opposition to any mining or drilling activity on the lands, and in 1983 the Tribal Business Council passed a resolution stating that the Tribe refused to grant, or to give permission to the BIA to grant, any easements or rights of way "relative to mineral exploration and/or roadway construction within ... the Hill Creek Extension." In September 1983 the BIA notified Del–Rio of the Tribe's action and advised Del–Rio that "this office considers all of those applications previously submitted for rights-of-way in this area as void. Until such time as these restrictions are lifted, new applications for rights-of-way in this area will not be accepted."

Because of the lack of rights-of-way, Del–Rio was forced to cease its oil and gas operations on the leased properties. In early 1984, the BIA referred the matter to the BLM with a recommendation that Del–Rio's leases be terminated for non-compliance with the requirement in the leases that Del–Rio maintain production throughout the lease periods. Rather than terminating the leases, the BLM granted Del–Rio's request for a Suspension of Operations and Production for the leases, based on what the BLM termed the "restrictive measure imposed by the Ute Indian Tribe resolution denying access to the unit across Tribal land." The Suspension of Operations and Production remained in effect until 1986, when the BLM notified Del–Rio that it had to establish production or risk expiration of the leases. In October 1987, Del–Rio and the Ute Indian Tribe entered into a surface access agreement for the affected leases. Del–Rio did not commence

production at that time because, as it explained to the trial court, an agreement that allowed groups of individual leases to be operated jointly had lapsed. As of January 1989, the relevant leases expired without producing paying quantities of oil or gas.

Del–Rio filed suit in the Court of Federal Claims, alleging that the government had breached its obligations to Del–Rio under the leases and, in the alternative, that the leasehold interests had been taken from Del–Rio for public use without just compensation, in violation of the Fifth Amendment. The parties filed several sets of motions for summary judgment on both the contract and takings claims.

On March 15, 1996, in an opinion that was subsequently withdrawn, the Court of Federal Claims denied both parties' motions for summary judgment. The court addressed and rejected the government's contention that the Tribal Consent Act, 25 U.S.C. §§ 323–324, justified the decision of the Interior Department requiring Del–Rio to obtain rights-of-way from the Ute Indian Tribe. Under the court's analysis, the government retained an easement by necessity when it conveyed the surface estate in the Hill Creek Extension to the Tribe, and that easement was conveyed to Del–Rio under the leases. However, the court invited additional briefing on whether Del–Rio could maintain its action under the Tucker Act when "what is really challenged is the applicability of the [Tribal Consent Act] to the subject leases." *Del Rio Drilling Programs, Inc. v. United States,* 35 Fed.Cl. 186, 197–98 (1996).

In response to the court's invitation for further briefing, the government filed a motion contending that the Court of Federal Claims lacked jurisdiction over the complaint because Del–Rio refused to concede the validity of the government's actions in denying the permits. The government argued that Del–Rio sought to draw into question the legality of agency conduct, a question that is not properly within the jurisdiction of the Court of Federal Claims in a takings action. The government did not argue in the Court of Federal Claims (and has not argued here) that Del–Rio improperly failed to exhaust its administrative remedies within the Department of the Interior.

The court granted the government's motion and dismissed the complaint. *Del–Rio Drilling Programs, Inc. v. United States,* 37 Fed.Cl. 157 (1997). With respect to the takings claim, the court ruled that a person claiming that his property was taken "must be prepared to allege that the Government is not acting in violation of any law other than the failure to pay compensation called for by the Fifth Amendment.... The Government should not be forced to buy private property if its agents act without authority, or, if merely perfecting the particular way power was exercised obviates any claim for relief." *Id.* at 161.

The court noted that it had already ruled in its prior opinion that the BIA and the BLM had erred as a matter of law in giving the Ute Tribe a "veto" over access to Del–Rio's mineral leases in reliance on the Tribal Consent Act. That legal ruling was a necessary part of Del–Rio's case, the court explained. If the Tribal Consent Act required that the leaseholds be subject to the Tribe's exercise of veto power, the government's actions "would not have deprived Del–Rio of a property interest," because the leases "would have been encumbered from the outset by the need to get tribal consent." *Id.* at 162. The gravamen of Del–Rio's complaint, in the court's view, was that "the BLM, acting in its regulatory capacity, erred in conditioning exercise of the [permits] on obtaining tribal consent." The court therefore viewed the complaint as seeking relief from unlawful administrative action, not from a taking. *Id.*

Turning to Del–Rio's breach of contract claim, the court disposed of that claim with a brief discussion:

The same analysis is fatal to the contract allegation. Although leases partake of all the relevant characteristics of contracts, it would be unrealistic to evaluate the present facts through a contract prism. The lease, in short, is really part of a much broader statutory scheme that is implemented and enforced by the BLM acting in its regulatory capacity. An allegation that the agency "breached" the lease by failing to ensure access is really a challenge to the BLM's interpretation of the TCA in fulfill-

ment of its statutory duties to enforce the leasing regulatory scheme. 37 Fed.Cl. at 162. The trial court dismissed Del–Rio's takings claim for failure to state a claim on which relief could be granted and dismissed the contract claim for lack of subject matter jurisdiction. *Id.* at 161. Del–Rio appeals from both portions of the court's order.

## II

Analyzing Del–Rio's takings claim requires us to address two questions that arise from time to time at the preliminary stage of "inverse condemnation" cases. The first is whether the government conduct at issue was "authorized," *i.e.,* whether the alleged invasion of property rights is chargeable to the government or is an act committed by a government agent acting *ultra vires.* The second is whether the complaint is properly understood to allege a Fifth Amendment taking for which just compensation is sought, rather than a separate statutory or regulatory violation for which damages or equitable relief is sought.

With respect to the first question, we conclude that the government conduct at issue in this case was "authorized" as that term is used in the law of takings. With respect to the second question, we conclude that Del–Rio's case is premised on a taking of property and not on a statutory or regulatory violation. We therefore disagree with the ruling of the trial court that Del–Rio's takings claim does not state a claim on which the Court of Federal Claims may grant relief.

## A

A compensable taking arises only if the government action in question is authorized. *See United States v. North Am. Transp. & Trading Co.,* 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920). If the government action is unauthorized, "the acts of defendant's officers may be enjoinable, but they do not constitute taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or former owner." *Armijo v. United States,* 229 Ct.Cl. 34, 663 F.2d 90, 95 (1981); *see Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 898 (Fed.Cir.1986). In a case such as this one, in which the alleged

taking consists of regulatory action that deprives a property-holder of the enjoyment of property, government agents have the requisite authorization if they act within the general scope of their duties, *i.e.,* if their actions are a "natural consequence of Congressionally approved measures," *NBH Land Co. v. United States,* 217 Ct.Cl. 41, 576 F.2d 317, 319 (1978), or are pursuant to "the good faith implementation of a Congressional Act," *Southern Cal. Fin. Corp. v. United States,* 225 Ct.Cl. 104, 634 F.2d 521, 525 (1980). The principle underlying this rule is that when a government official engages in *ultra vires* conduct, the official "will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the Government 'founded upon the Constitution.' " *Hooe v. United States,* 218 U.S. 322, 335, 31 S.Ct. 85, 54 L.Ed. 1055 (1910).

In holding that *ultra vires* conduct cannot give rise to a Fifth Amendment taking, the courts have drawn an important distinction between conduct that is "unauthorized" and conduct that is authorized but nonetheless unlawful. Merely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is later determined to have been contrary to law. *See Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 695, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) ("if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law"). As Judge (now Justice) Scalia explained for the panel in *Ramirez de Arellano v. Weinberger,* 724 F.2d 143, 151 (D.C.Cir. 1983), *rev'd,* 745 F.2d 1500 (D.C.Cir.1984) (in banc), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985), "the mere fact that a government officer has acted illegally does not mean he has exceeded his authority for Tucker Act purposes, even though he is not 'authorized' to break the law." A Tucker Act remedy lies if a taking occurs while the government officer "is acting within the normal scope of his duties ... unless Congress has expressed a

positive intent to prevent the taking or to exclude government liability." *Id.* Although the en banc D.C. Circuit vacated the panel's judgment in the *Ramirez* case, the en banc court did not disagree with the panel's analysis of the authorization issue. *See* 745 F.2d at 1523–24 ("Not all illegal acts of government officials are considered unauthorized for the purpose of determining the government's liability to pay compensation under the Tucker Act.... Recovery under the Tucker Act has been permitted when a taking by an officer is the natural consequence of congressionally approved measures or the result of an exercise of discretion granted to an official for the implementation of a congressional statute.").

■ While this court has on occasion referred to "invalid" or "illegal" government conduct as "unauthorized" for purposes of determining whether the conduct may give rise to Tucker Act liability, *see Short v. United States*, 50 F.3d 994, 1000 (Fed.Cir.1995); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed.Cir.1993), we understand those references to require a showing that the conduct was *ultra vires, i.e.,* it was either explicitly prohibited or was outside the normal scope of the government officials' duties. Neither the Supreme Court nor this court has held that government conduct is "unauthorized," for purposes of takings law, merely because the conduct would have been found legally erroneous if it had been challenged in court. *See United States v. Great Falls Mfg. Co.,* 112 U.S. 645, 656, 5 S.Ct. 306, 28 L.Ed. 846 (1884) (even if government officials' conduct could have been enjoined, claimant was entitled to treat the action as a taking and demand just compensation); *Eyherabide v. United States,* 170 Ct.Cl. 598, 345 F.2d 565, 570 (1965) (government officials' conduct "cannot be characterized as unauthorized merely because they may have been mistaken, imprudent, or wrongful"). Accordingly, a court's conclusion that government agents acted *unlawfully* does not defeat a Tucker Act takings claim if the elements of a taking are otherwise satisfied.

■ It is clear that the Interior Department officials who denied drilling permits to Del–Rio and advised Del–Rio that it had to obtain rights-of-way from the Ute Tribe were acting within the scope of their statutorily authorized duties. It was part of their job to interpret the statutes and regulations governing federal mineral leases, and there is no reason to suppose that their decision reflected anything but a good faith effort to apply the statutes and regulations as they understood them; certainly the government does not argue to the contrary. In short, the officials of the Interior Department who denied a permit to Del–Rio had "the authority to regulate the proposed mining." *Florida Rock,* 791 F.2d at 899. The issue of authorization is therefore no impediment to Del–Rio's takings claim.

**B**

As the trial court viewed the case, Del–Rio should have sought review of the Interior Department's action in a United States district court under the Administrative Procedure Act ("APA"). If an administrative action is legally vulnerable, the court stated, "the preferred remedy should be to reverse the action." The court added that if the government has acted "under a misconception of its legal rights or obligations, the better alternative is ... to attempt to restore the status quo.... Only if the action is 'valid,' *i.e.,* unassailable on some independent constitutional, statutory, or procedural ground, should the Takings Clause be implicated." *Del–Rio,* 37 Fed.Cl. at 161.

**1**

■ To the extent that the trial court meant to suggest that a takings claim does *not lie if the government's action was legally flawed in some respect,* we disagree. If the government appropriates property without paying just compensation, a plaintiff may sue in the Court of Federal Claims on a takings claim regardless of whether the government's conduct leading to the taking was wrongful, and regardless of whether the plaintiff could have challenged the government's conduct as wrongful in another forum. It is true that in some circumstances it might be more efficient to cure legal defects in the contested governmental action rather than forcing the government to pay for appropriated property, but if the government has taken property and has done so in a legally

improper manner, it has committed two violations of the property-owner's rights. The two separate wrongs give rise to two separate causes of action, and the property-owner may elect to sue for just compensation or to seek relief for the legal improprieties committed in the course of the taking. *See First English Evangelical Lutheran Church v. County of L.A.*, 482 U.S. 304, 319–22, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *Great Falls Mfg. Co.*, 112 U.S. at 656, 5 S.Ct. 306 ("if, for the want of formal proceedings for its condemnation to public use, the claimant was entitled, at the beginning of the work, to have the agents of the government enjoined from prosecuting it ... there is no sound reason why the claimant might not waive that right, and, electing to regard the action of the government as a taking under its sovereign right of eminent domain, demand just compensation").

### 2

A second aspect of the trial court's ruling presents a more complex question. The court noted that at the summary judgment stage the parties focused on whether the Tribal Consent Act required Del–Rio to obtain additional rights-of-way from the Ute Tribe. The Interior Department argued that the Tribal Consent Act required Del–Rio to obtain rights-of-way from the Tribe, and Del–Rio argued that it did not. The court ruled that, because the correctness of administrative action cannot be challenged in a takings action before the Court of Federal Claims, Del–Rio was required to concede that the Department's construction of the Tribal Consent Act was correct. Yet if that point is conceded, the court explained, the Interior Department's actions "would not have deprived Del–Rio of a property interest," in which case "the taking claim disappears." The government makes the same argument on appeal in support of the trial court's decision to dismiss Del–Rio's takings claim.

It is true, of course, that Del–Rio's complaint asserts that the government's permit denial was improper (because it constituted a taking for which just compensation was not paid). But that is true in every takings action. Del–Rio did not seek to overturn the government's permit denial on the ground

that it was contrary to some statute, regulation, or constitutional provision (other than the Fifth Amendment takings clause). Nor was it essential to Del–Rio's takings claim that it demonstrate that the Interior Department acted unlawfully when it voided Del–Rio's drilling permits.

In order to establish its right to recover under a Tucker Act takings claim, Del–Rio must prove that its property rights under the leases included a right-of-way on the trust lands sufficient to extract the oil and gas from the leased properties. If the government is correct in its contention that the leases must be read in light of the Tribal Consent Act, and that the Act gives tribes such as the Ute Indian Tribe power to deny rights-of-way across trust lands to mineral estate lessees, Del–Rio's takings claim will fail because Del–Rio will not have shown that it was deprived of any property interest. But the fact that the existence of a property interest may turn on the construction of a statute does not take this case outside the scope of the Tucker Act.

In the course of adjudicating takings claims, the Court of Federal Claims frequently must make determinations as to the scope of a party's property interests, and those determinations often turn on questions as to the meaning of state or federal statutes or regulations. *See, e.g., Preseault v. United States,* 100 F.3d 1525, 1534–37 (Fed.Cir.1996) (in banc); *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995); *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 215–17 (Fed.Cir.1993); *Yaist v. United States,* 228 Ct.Cl. 281, 656 F.2d 616, 620–21 (1981); *Foster v. United States,* 221 Ct.Cl. 412, 607 F.2d 943, 947 (1979); *Bourgeois v. United States,* 212 Ct.Cl. 32, 545 F.2d 727 (1976). In such cases, it is frequently the case that the takings claim will arise from action by a federal agency that is based on the agency's view that the private party does not enjoy the particular property right it claims. But the fact that the Court of Federal Claims may have to resolve a dispute about the scope of the private party's property interest has not been regarded as fatal to the plaintiff's Tucker Act complaint.

■ The government's argument, in essence, is that a plaintiff may not bring a takings action in the Court of Federal Claims if the agency decision underlying the takings claim is based on, or can be defended on, the ground that the plaintiff does not enjoy compensable rights in the property that was allegedly taken. In such cases, the government argues, the plaintiff must first obtain review of the agency's decision in a district court under the APA; only after having obtained a favorable ruling from a district court on the property right issue may the plaintiff pursue a takings claim in the Court of Federal Claims.

In pressing that argument, the government relies on a series of cases from this court stating that a plaintiff bringing a takings claim before the Court of Federal Claims must assume or concede the correctness of the government action that is alleged to constitute the taking. *See Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed. Cir.1993); *Florida Rock,* 791 F.2d at 899; *see also 767 Third Ave. v. United States,* 48 F.3d 1575, 1579 n. 3 (Fed.Cir.1995). As we noted above, however, those statements mean that the plaintiff in a takings action cannot assert that the government conduct was unauthorized, since conduct by a government official who is acting *ultra vires* cannot effect a governmental taking for public purposes within the meaning of the Fifth Amendment. *See Armijo,* 663 F.2d at 95. The cases cited by the government do not stand for the proposition that the Court of Federal Claims loses jurisdiction to decide a takings claim whenever the government seeks to defend the agency action on the ground that the plaintiff lacks the property right on which its takings claim is based. In fact, the law under the Tucker Act is to the contrary. *See Bourgeois,* 545 F.2d at 729 n. 1 (Court of Claims was not deprived of jurisdiction over takings action simply because it had to determine who owned land to which the government and the plaintiff had made conflicting claims).

In the *Florida Rock* case, upon which the government places especially heavy reliance, the plaintiff brought a takings claim in the Claims Court, alleging that its property had been taken when the Army Corps of Engineers barred it from conducting limestone mining on its property on the ground that the mining activities would pollute a protected wetlands. This court stated that if the proposed mining activities would not result in pollution, the Corps would have no jurisdiction to prohibit those activities, *i.e.,* no "statutory authority to act." 791 F.2d at 898. The court then explained that "[t]he Tucker Act suit in the Claims Court is not ... available to recover damages for unauthorized acts of government officials." *Id.* It was in that context that this court stated:

> We now hold that the election of a Tucker Act suit, without a previous test of validity issues under the APA, accomplishes the same result [as an APA decision upholding the validity of a permit denial] because of the necessity of conceding the engineers' authority to act. In defending, the government may deny the authority and in that way authority could become an issue in a Tucker Act taking case.

791 F.2d at 899. The court's focus in *Florida Rock* was thus on the issue of authorization, and the court properly held that a plaintiff in a Tucker Act suit cannot obtain relief if the government officials in question were acting without authorization. *Florida Rock* does not stand for the proposition that the government can defeat Tucker Act jurisdiction by arguing that the underlying government conduct was lawful and that there would be no takings liability if the government conduct is upheld.

In characterizing Del–Rio's claim as a challenge to the correctness of administrative action and arguing that such a challenge may only be brought in a district court under the APA, the government also relies on a line of cases holding that when an agency determines that a private party is not the owner of property that is claimed to have been taken, the private party must challenge that determination in district court under the APA and may not do so through a Tucker Act takings action in the Court of Federal Claims. *See Aulston v. United States,* 823 F.2d 510 (Fed. Cir.1987); *Freese v. United States,* 221 Ct.Cl. 963, 1979 WL 10420 (1979); *Patterson v. United States,* 115 Ct.Cl. 348 (1950); *Dawson v. United States,* 113 Ct.Cl. 82, 81 F.Supp. 1021 (1949).

■

In *Aulston,* the government granted homestead patents to the plaintiffs but reserved for itself the rights to "oil and gas" in the patented land. Large reserves of carbon dioxide in liquid form were subsequently discovered on the property. The Aulstons claimed that the carbon dioxide was not within the definition of "oil and gas" and sought a determination from the Department of the Interior to that effect. The Department, however, ruled that under the terms of the reservation the United States owned the carbon dioxide. When the Aulstons sought relief through a Tucker Act takings claim, the Claims Court dismissed the complaint on the ground that the Aulstons should have sought review of the Interior Department's decision in district court under the APA. This court affirmed, basing its ruling on the line of Court of Claims cases cited above and explaining those decisions as follows:

> These opinions all hold squarely that, where the administrative agencies of the Interior Department have decided that the United States (not the claimants) own the disputed property, the Court of Claims could not review or overturn that administrative determination even though that court indisputably had jurisdiction over "taking" claims. The authority to review Interior's administrative decision lay initially in the district courts and then in the regional courts of appeals.... As Judge Wiese noted, "the Claims Court does not acquire authority to review an agency action otherwise reviewable only in district court merely because plaintiff's effort to obtain review is couched in terms of a taking claim."

823 ·F.2d at 514 (quoting *Aulston v. United States,* 11 Cl.Ct. 58, 61 (1986)).

The government contends that the *Aulston* line of cases stands for the broad proposition that the Court of Federal Claims lacks jurisdiction to review challenges to agency action in a Tucker Act suit. According to the government, Del Rio is improperly seeking to use a Tucker Act takings claim to challenge agency action—the Interior Department's decision that Del–Rio needed tribal consent to cross the trust lands. The Court of Federal Claims, the government argues, does not have jurisdiction to entertain such a claim.

The *Aulston* line of cases does not support the government's argument on this point. In each of those cases, an agency was charged with making determinations as to the scope of a private party's property rights, and the agency made a determination adverse to the private party. For example, all of the cases on which *Aulston* was based involved mining claims in which the Department of the Interior was charged with the responsibility of determining the validity of mining claims on public property. Likewise, in *Aulston* itself the agency action that the plaintiff challenged was an explicit adjudication of the scope of the Aulstons' property rights, which the court characterized as binding on the Aulstons unless overturned by a court of competent jurisdiction. 823 F.2d at 513. In that setting, the court held, the agency's adjudication of property rights could only be reviewed by a district court under the APA; it was not subject to collateral attack in a Tucker Act suit brought in the Claims Court. *Id.*

This case is quite different in character from any of the· *Aulston*-type cases. The Interior Department did not base its decision to require Del–Rio to obtain tribal consent on an adjudication of the extent of Del–Rio's property rights conveyed by the leases. In fact, until several years into this litigation the government took the position that Del–Rio's leases gave Del–Rio the right to use the trust lands to the extent necessary to exercise its extraction rights under the lease, subject only to reasonable conditions for access. Del–Rio's Tucker Act complaint therefore cannot be viewed as simply a collateral challenge to a property rights determination made by the agency.

This court's decision in *United Nuclear Corp. v. United States,* 912 F.2d 1432 (Fed. Cir.1990), demonstrates that the government's reading of the *Aulston* line of cases is too broad. In that case, the court found a compensable taking when the Interior Department required a private company to obtain tribal consent before being permitted to mine on leased property. Even though the plaintiff was challenging the propriety of the agency's conduct in denying mining permits absent the approval of the Navajo Tribe, the

case was brought under the Tucker Act, and this court found that the denial of mining permits had the effect of taking United Nuclear's property without just compensation. The plaintiff in the *United Nuclear* case had tried to obtain district court review of an Interior Department decision, but its complaint had been dismissed on jurisdictional grounds without a ruling on the lawfulness of the Department's action.

Del–Rio's complaint against the Department of the Interior is similar to United Nuclear's claim for purposes of determining whether it stated a claim under the Tucker Act. In both cases, the plaintiff filed a takings action under the Tucker Act without having first obtained a ruling in an APA action as to the lawfulness of the government conduct at issue. In *United Nuclear*, this court proceeded to adjudicate the plaintiff's takings claim notwithstanding the absence of any prior district court ruling on the issue of lawfulness. We see no reason to deny Del–Rio a similar hearing on the merits of its takings claim in the Court of Federal Claims. Accordingly, we reverse the dismissal of that count of the complaint and remand to the trial court for further proceedings on that count.

### III

■ In addition to the takings claim, Del–Rio requested relief on a contract claim, seeking to recover damages from the government on the theory that the government breached its duties under the lease contract when it refused to grant Del–Rio unconditional permits to drill on the leased properties. We conclude that the Court of Federal Claims erred in dismissing that claim for lack of jurisdiction on the ground that the claim was really a challenge to the BLM's interpretation of the Tribal Consent Act.

As the trial court noted, the proper interpretation of the Tribal Consent Act may be important in determining whether the leases afford rights-of-way to Del–Rio. But the fact that the court may have to interpret the Tribal Consent Act or make other determinations regarding principles of state and federal law in order to resolve the contract claim does not deprive the court of jurisdiction to decide that claim. It is often necessary to interpret or apply statutory or common law

principles in order to resolve contract claims, but the fact that the resolution of a contract claim may turn on the interpretation of a statute does not deprive the Court of Federal Claims of jurisdiction over that claim.

The Tucker Act gives the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). That broad jurisdictional grant does not exempt contract claims that turn on the construction of statutes.

■ Nor is any contract claim otherwise falling under the Tucker Act defeated on the ground that the conduct that constituted an alleged breach of contract was a tort and was therefore "unauthorized." *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. at 703 n. 27, 69 S.Ct. 1457. There are, of course, instances in which courts find that Congress has displaced Tucker Act jurisdiction in favor of some other remedial scheme. *See, e.g., Matson Navigation Co. v. United States*, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932) (admiralty cases); *Harris v. United States*, 841 F.2d 1097, 1100–01 (Fed.Cir. 1988) (civil service remedies); *John Muir Mem'l Hosp., Inc. v. United States*, 221 Ct. Cl. 843, 846, 1979 WL 10395 (1979) (review of Social Security Act reimbursements). The government has not pointed to any displacing statute (except to reiterate its argument that review of the Interior Department's decision should be in the district court under the APA), and we find no such instance of congressional withdrawal of Tucker Act contract jurisdiction in this case.

The trial court dismissed the contract claim on the ground that the leases on which the contract claim is based are "really part of a much broader statutory scheme that is implemented and enforced by the BLM acting in its regulatory authority." It is true, of course, that the respective rights of the parties conferred by the leases must be analyzed in light of the statutes and regulations governing the subject matter of mining on trust lands. Nonetheless, the leases are contractual undertakings by the government upon which citizens are entitled to sue in the Court of Federal Claims. We therefore disagree

with the trial court that it lacked jurisdiction to address Del–Rio's contract claim. Without intimating how the contract issue should be resolved on the merits, we reverse the jurisdictional dismissal of that count of Del–Rio's complaint and remand that portion of the case to the Court of Federal Claims for further proceedings.

*REVERSED and REMANDED.*